**SMITH CORONA CORPORATION,**
**Plaintiff,**

v.

**The UNITED STATES, Defendant,**

**and**

**Canon Inc., Canon U.S.A. Inc., Canon Business Machines, Inc., Brother Industries, Ltd., Brother International Corp., Brother Industries (USA), Inc., Matsushita Electric Industrial Co., Ltd., Kyushu Matsushita Electric Co., Ltd.,**

**Matsushita Electronic Components Co., Ltd., Panasonic Company, Panasonic Communication and Systems Company, and Panasonic Industrial Company, Unincorporated Divisions of Matsushita Electric Corporation of America, Defendant–Intervenors.**

**Court No. 91–09–00717.**

United States Court of
International Trade.

July 10, 1992.

Stewart & Stewart, Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr., John M. Breen and Todd C. Fineberg, Washington, D.C., for plaintiff.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Marc E. Montalbine, Jeffery C. Lowe, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, Washington, D.C., of counsel, for defendant.

Covington & Burling, Harvey M. Applebaum, Sonya D. Winner, David R. Grace and Thomas O. Barnett, Washington, D.C., for defendant-intervenor Canon Inc.

Tanaka Ritger & Middleton, H. William Tanaka and Patrick F. O'Leary, Washington, D.C., for defendant-intervenor Brother Industries.

Weil, Gotshal & Manges, Jeffrey P. Bialos, Angela J. Paolini Ellard and Martin S. Applebaum, Washington, D.C., for defendant-intervenor Matsushita.

## OPINION

RESTANI, Judge:

This matter is before the court pursuant to plaintiff's Rule 56.1 motion for judgment on the record. Plaintiff challenges the antidumping duty determination of the Department of Commerce, International Trade Administration ("Commerce" or "ITA") in *Personal Word Processors From Japan*, 56 Fed.Reg. 31,101 (Dep't Comm. July 9, 1991) (final determination of sales at less than fair value). Plaintiff argues that Commerce erred in denying its request to expand the scope of the investigation to cover parts and components dedicated for use in personal word processors ("pwp's"), and in utilizing the preliminary margin found for Brother Industries, Ltd. as the best information available ("BIA") for setting final dumping margins.

### Facts

Plaintiff filed its petition initiating this matter on November 6, 1990. The petition requested "imposition of antidumping duties on personal word processors and subassemblies thereof from Japan...." Public Record Document ("Pub.Doc.") 1 at 3. Plaintiff clarified the scope of the relief requested twice during the month of November without requesting coverage of parts. It also made clear that it was not concerned with any parts or components which were not ready for use. At that time plaintiff appeared to be concerned more with changing technologies, as opposed to importation of parts. Commerce rejected various of the methodologies suggested by plaintiffs and, for purposes of the initiation of the investigation, it adopted two methodologies which resulted in dumping margins ranging between 0 and 32.37 percent. *See Personal Word Processors from Japan*, 55 Fed.Reg. 49,662, 49,663 (Dep't Comm. Nov. 30, 1990) (initiation of antidumping duty investigation). Commerce defined the scope of the investigation to cover:

> integrated personal word processing systems and major finished units thereof ("word processors"), which are defined as devices designed principally for the composition and correction of text.

*Id.*

In keeping with plaintiff's statement in its clarifying letter that the petition did not cover "unmounted or unfinished CRT or

solid-state display units, keyboards, or disk drives, that are not ready for use as a part of a word processing system," Pub.Doc. 2 at 4–5, Commerce stated that the investigation covered only major units of pwp's, that is, keyboards and chassis/frames designed for use in pwp's, and printers and video displays dedicated for use in pwp's. 55 Fed.Reg. at 49,664. Commerce stated further that "[m]ajor finished units are distinguished from parts or subassemblies in that they do not require any additional manufacturing before functioning as a complete unit of a word processor. Neither parts nor subassemblies are included in the scope of this investigation." *Id.*

No complaints were heard about the scope of the investigation, and on April 15, 1991, Commerce issued its preliminary determination finding a dumping margin based on Brother's questionnaire response of 58.71 percent. *See Personal Word Processors from Japan,* 56 Fed.Reg. 16,-296 (Dep't Comm. Apr. 22, 1991) (preliminary determination of sales at less than fair value). Kyushu Matsushita Electric Co., Ltd., the only other company requested to participate, declined to do so. Thus, for purposes of the preliminary determination, Brother's margin was applied to all other companies. On the same date the preliminary determination was issued, Brother asked to withdraw from the investigation. On May 20, Brother withdrew its proprietary data, on which the preliminary margin was based, from the record.

On May 15, 1991, one month after the preliminary determination, and forty-five days before the final determination was due, for the first time Smith Corona requested modification of the scope of the investigation. Smith Corona did so on the basis that it had just learned that Brother was going to begin an assembly operation in Tennessee, which would entail the importation of parts of pwp's. Smith Corona also submitted three methodologies for the calculation of a BIA margin for Brother. Commerce tentatively found one of the methodologies viable.

Following a public hearing on the issues in dispute, Commerce declined to expand the scope. In the final determination Commerce found Smith Corona's request for parts coverage vague and untimely. It also found that Smith Corona's failure to segregate typewriter parts from its aggregate data on increase in parts imports left its allegation of increased imports of pwp parts unsupported. *See* 56 Fed.Reg. at 31,103–05.[1] Commerce then invited Smith Corona to pursue a separate request for anticircumvention relief pursuant to 19 U.S.C. § 1677j (1988). *Id.* at 31,105. Commerce also adopted the preliminary rate as BIA for the final rate. *Id.* at 31,103.

Discussion

*I. Decision not to expand scope of investigation.*

■ It is clear from Commerce's original decision on scope, contained in the initiation of investigation, that from the outset parts and subassemblies were not to be covered in the investigation. Accordingly, this matter is distinguishable from the numerous cases wherein Commerce has exercised its discretion to clarify the scope of orders which were ambiguous when issued or which became ambiguous due to the introduction of new technology into the market. *See Royal Business Machines, Inc. v. United States,* 1 CIT 80, 87 n. 18, 507 F.Supp. 1007, 1014 n. 18 (1980), *aff'd,* 669 F.2d 692, 69 CCPA 61 (Fed.Cir.1982) (when antidumping order is unclear, Commerce can define the class in its terms); *Mitsubishi Electric Corp. v. United States,* 12 CIT 1025, 1045, 700 F.Supp. 538, 554 (1988), *aff'd,* 898 F.2d 1577 (Fed.Cir.1990) (ITA may clarify scope of investigation where, at time petition was filed, industry was new and subject to technological developments and changes in industry practice).

Smith Corona argues that Brother's assembly operation is an attempt to circumvent the antidumping laws and the change in the scope is necessary to fulfill Congressional intent. Congress has passed legisla-

---

1. Smith Corona argues that testimony of a Brother executive that Brother was increasing pwp assembly in Tennessee also indicates parts imports were increasing. This general testimony does not indicate the magnitude or source of parts importation.

tion which is specifically designed to cover circumvention of an outstanding antidumping order by means of domestic assembly. *See* 19 U.S.C. § 1677j (1988). This provision, however, applies to issued orders; it does not apply to proceedings which are ongoing. This is not to say that under certain circumstances Commerce cannot include parts within the scope of investigations largely aimed at the finished product, or that it cannot clarify ambiguous scope determinations if it finds the investigation was intended to cover parts. Commerce, however, must exercise caution in redefining scope in midstream to include items which were clearly known about and excluded at the time of initiation of the investigation, and, indeed in this case, at the time of the preliminary determination.

Various procedural safeguards such as opportunities to respond and to be heard are built into the unfair trade laws. To change the scope definition at late stages of the proceedings deprives the parties of the full benefits of those procedures. Furthermore, the International Trade Commission ("ITC") must make its determination of like product and its determination of injury in relation to Commerce's definition of the class or kind of imported merchandise being investigated. Late changes in scope definitions can cause problems with this process and can even lead to unintended divergences from commitments pursuant to international obligations. The anti-circumvention statute provides for Commerce and ITC consultation on these difficulties, and presumably appropriate solutions can be found. There is no specific mechanism for consultation on this subject midstream in an ongoing investigation. Perhaps there is no such need because if the need arose, ITC could adjust during its final determination. Of course, changes between the ITC preliminary and final determinations also may lessen the effectiveness of some procedural safeguards. Plaintiff argues that inclusion of parts *dedicated for use* in pwp's would not cause

major disruption, but it clearly would be some change. In any case, Commerce has strict deadlines to meet and it is difficult to see how it can perform the investigation within the statutorily required time, if a scope change is requested in the final prehearing brief, as occurred here.

The court is not unaware of the problem faced by plaintiff. It did not know of any need for a broader scope definition until shortly before it raised the issue with Commerce. It is faced with the possibility of a largely useless order. But, although the remedies are not without cost and may achieve less than plaintiff might desire, plaintiff did have the options of filing a new petition or awaiting the issuance of the order and seeking relief under the mechanism Congress set up to handle circumvention issues.

Accordingly, the court finds no abuse of discretion by Commerce on this matter. There is no conflict with *Mitsubishi Elec. Corp.*, 12 CIT 1025, 700 F.Supp. 538, in which scope was defined mid-investigation to include subassemblies. The differences in the two cases are many. In *Mitsubishi*, subassemblies were never specifically excluded, ITC had investigated subassemblies, the merchandise was subject to innovation in industry practice and technology, a specific workable scope definition including the relevant subassemblies was presented,[2] the decision on the scope change was made earlier in the investigation (in fact, prior to the preliminary determination), and the scope change was, at least arguably, a clarification. The case at hand more closely resembles *Certain Internal–Combustion, Industrial Forklift Trucks From Japan*, 53 Fed.Reg. 12,552, 12,566–67 (Dep't Comm.1988) (final determination of sales at less than fair value), in which a scope change was refused after the preliminary determination was made on grounds of procedural inequity and statutory time restraints. In that case circumvention concerns were voiced as well.

---

**2.** Smith Corona states that "parts dedicated for use in pwp's" is specific enough, and that this description was made at the final hearing. The hearing, however, occurred 19 days before the

final determination was due and ITA would be required to make a determination as to which parts were "dedicated for use."

*II. Brothers' preliminary rate as the best information as to the final rate.*

This case presents unusual difficulties for the selection of a proper final rate. First, the rate selected for initiation, although based on petitioner's data, was the lowest of all the possible rates. Second, the somewhat higher preliminary rate is based on data which is no longer in the record. Presumably, it was because of these facts that Commerce gave the parties the opportunity to submit further information on an appropriate rate. Plaintiff did submit additional proof to support one of the rates rejected at initiation. It used Brother's public data, which remained in the record, to establish the necessary adjustment for differences in the WP1 model sold in Japan and the model sold in the United States. Commerce then admitted that petitioner's new data establishing a rate of 150.60% was usable, but apparently it rejected that option as unduly punitive.[3]

■ Parties such as Brother and Kyushu Matsushita who refuse to participate in investigations are not entitled to special considerations. If they stand aside, they must accept any rate which is reasonably accurate based on information of record, even petitioner's information. Choosing lower rates does not fulfill the statutory intent of 19 U.S.C. § 1677e(c) (Supp.1992) of compelling participation. *See Rhone Poulenc, Inc. v. United States,* 899 F.2d 1185, 1190–91 (Fed.Cir.1990); *Atlantic Sugar Ltd. v. United States,* 744 F.2d 1556, 1560 (Fed.Cir.1984); *see also Pistachio Group of the Ass'n of Food Indus., Inc. v. United States,* 11 CIT 668, 679, 671 F.Supp. 31, 40 (1987) (final dumping margin of 241.14% based on BIA upheld when respondent's answer to ITA questionnaire was incomplete). Here, in ITA's own judgment, plaintiff provided a viable alternative

to use of an unsupported preliminary rate or the even lower initiation rate. As indicated, ITA seems to view this rate as "punitive." *See* Pub.Doc. 146 at 1.[4] While ITA may have valid policy concerns that this action may be construed as "punitive," this is not an acceptable reason for rejecting this rate. If the rate is "reasonably accurate," as ITA seems to believe it is, it is not punitive as to these parties.

■ Furthermore, the lower rate selected by Commerce cannot be used as to Brother and Kyushu Matsushita because such use would deprive plaintiff of its right to judicial review. The data supporting the rate has been withdrawn. Contrary to Brother's claim, this is not the equivalent of use of rates from earlier investigations as BIA, as sometimes occurs. Such rates normally would have been subject to challenge in the earlier reviews, and presumably would have a modicum of validity. The rate chosen here cannot be supported by substantial evidence because such evidence is not in the record. There is simply nothing to review.

In response to the court's suggestion that the "punitive rate" reasoning was insufficient, the government now argues, for the first time, that the 150.60% rate is not a desirable rate because the Japanese home market sample from which the rate was derived was small and that ITA would have rejected Japan as the home market. ITA was aware of these factors when it described the rate as viable, and these arguments are not persuasive. While the methodology petitioner was forced to use was not ideal and would not be used if respondents presented data, ITA found it to be an acceptable methodology. ITA's practice and court decisions require that the highest usable rate be applied in this situation. Any other result unfairly rewards respon-

**3.** After Commerce pronounced the 150.60% rate viable, *see* Pub.Doc. 131, Brother's brief was submitted. The brief indicated that Brother's public data was based on a WP–1 model which might differ from the Japanese WP–1 model. As Brother's data had been withdrawn, there would be no way for Commerce to assess this claim. Thus, we may assume that the viability determination would not change based on this argument. The nature of the Japanese market,

which was also raised by Brother in its brief, was already known to Commerce.

**4.** This document also indicates that the rate is inconsistent with the initiation rate. This is a valid reason for rejecting the rate as to the parties not requested to participate, as is discussed *infra.*

dents for their nonparticipation and is contrary to the statute and ITA's past practice.

A BIA rate need not be a perfect rate; it is simply the rate Commerce finds most suitable in the particular circumstances, which is also supportable. Commerce does not dispute that its usual practice is to apply the highest viable rate in this circumstance. Accordingly, Brother and Kyushu Matsushita must receive the highest viable rate, instead of a rate based on Brother's unreviewable data. At this point, the court might simply declare that the 150.60% rate be applied to the noncooperative parties. In its final determination, however, ITA did not specifically address the arguments made by the respondents as to the 150.60% rate. Most of them would seem to be unacceptable, but ITA should have the opportunity to determine if the rate needs to be adjusted based on some data still in the record so that a reasonably accurate result is achieved.

■ Commerce, no doubt, would prefer to give all parties a rate based on verified data, which it does not have. None of the parties have argued that they are *entitled* to the 32.37% rate merely because it was the initiation rate, although in the absence of respondent participation, normally the initiation rate would become the BIA rate.[5] The nonparticipants have no control over the respondent's withdrawal of documentation and had no reason to believe, at the time they could have offered their own data, that a 150.60% rate, which was constructed after the withdrawal of documentation, would be imposed as to them. Thus, as ITA concluded, a rate lower than the highest rate may be applied to the nonparticipants without offending the statute. In this situation, the court cannot say that Commerce erred in rejecting the unverified 150.60% rate for basically "innocent" parties who were caught unawares.

Although the rate imposed is not subject to verification, the nonparticipating parties have not appealed the rate imposed. Plaintiff, for its part, has not suggested a reasonable alternative approach for the nonparticipants.[6] Therefore, the court declines to order a remand for selection of a new rate for these parties. In any case, before final assessments are made, parties who believe their data supports lower rates may ask for an administrative review. Similarly, if plaintiff believes a higher rate should be assessed, it also may request a review.

Accordingly, this matter is remanded for Commerce to apply the 150.60% rate to Brother and Kyushu Matsushita or to adjust the rate as is appropriate. The remand results are due within thirty days.

---

**5.** The late withdrawal of the documentation, after the preliminary rate demonstrated a higher rate than the initiation notice, has caused this odd situation.

**6.** As the 150.60% rate need not be applied, plaintiff's arguments would lead to imposition of the initiation rate, which is lower than the rate selected by Commerce and is based on plaintiff's own data. Thus, plaintiff is not in a position to object to the rate applied to these parties.

