**NOVACHEM, INC., Plaintiff,**

**v.**

**UNITED STATES, Defendant.**

**Court No. 91–06–00415.**

United States Court of
International Trade.

Aug. 28, 1992.

**1034**

Baker & McKenzie, Thomas Peele and Steven F. Fabry, Washington, D.C., for plaintiff.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice, Velta Melnbrencis and Paul Herrup, Washington, D.C. (David W. Richardson, Office of Chief Counsel for Import Admin., U.S. Dept. of Commerce, of counsel), for defendant.

## MEMORANDUM OPINION AND ORDER

DiCARLO, Chief Judge:

Plaintiff, an importer of Chinese potassium permanganate, challenges the Department of Commerce's calculation of foreign market value in *Potassium Permanganate from the People's Republic of China*, 56 Fed.Reg. 19,640 (Dep't Comm.1991) (final admin. review). Plaintiff contests Commerce's selection of Thailand as the surrogate economy country for the People's Republic of China (PRC). Plaintiff further contests Commerce's use of U.S. industry data in the absence of Thai data for sales, general and administrative expenses. The Court has jurisdiction under 28 U.S.C. § 1581(c) (1988). Commerce's determination is affirmed.

## BACKGROUND

On January 31, 1990, petitioner, Carus Chemical Company, requested Commerce to conduct an administrative review of 1989 entries of potassium permanganate from the PRC. In anticipation that Commerce would determine the PRC has a nonmarket, state-controlled economy and may be required to use data from a market economy, *see* 19 U.S.C. § 1677b(c) (1988), petitioner filed on March 16, 1990 a submission suggesting that Thailand be used as the surrogate for the administrative review and the use of other surrogates for the valuation of factors of production for which there was no Thailand information. R.Doc. 11. Thailand was used as the surrogate in the original antidumping investigation. *See Potassium Permanganate from the People's Republic of China*, 48 Fed.Reg. 57,347 (Dep't Comm.1983) (final).

On March 23, 1990, Commerce forwarded antidumping questionnaires to the China National Chemicals Import and Export Corporation, production facilities of potassium permanganate, and the eight Hong Kong resellers of potassium permanganate listed in petitioner's review request. R.Docs. 14, 15 & 41. Letters accompanying the questionnaires provided that the parties had 60 days to submit their responses and that lack of a response might result in Commerce proceeding on the best information available. R.Docs. 14 & 15.

Plaintiff requested that it be considered a party to the proceeding and asked for

copies of the antidumping law and regulations and questionnaires, which Commerce forwarded to plaintiff on August 16, 1990. R.Doc. 25. Commerce also informed plaintiff that it would be considered an interested party and would receive future Federal Register notices. *Id.* Plaintiff was not served with any other documents, however, until after the preliminary results were published. Plaintiff does not raise this issue as an independent basis of relief. *Pl's Br.* at 3.

On the same day, Commerce sent follow-up letters to the Chinese producers and Hong Kong resellers stating that no responses had been received. R.Docs. 27 & 28. The letters also stated that unless their responses had been mailed within 60 days of the date of receipt of the questionnaires they would not be used and Commerce may proceed on the best information otherwise available. R.Docs. 27 & 28.

On August 27, 1990, petitioner submitted information, using Thailand as the surrogate, for Commerce to consider in the event that the Chinese producers failed to submit responses. R.Doc. 35. The highest margin percentage calculated by the petitioner was 128.94%. R.Doc. 41 at 5.

Commerce relied upon petitioner's submissions as the best information available, because it did not receive responses from the Chinese producers, and established a preliminary antidumping duty rate of 128.-94%. *Potassium Permanganate from the People's Republic of China,* 55 Fed.Reg. 53,581 (Dep't Comm.1991) (prelim. admin. review). After briefing, a hearing and post-hearing briefing, Commerce established a final rate of 128.94%, the highest margin percentage contained in petitioner's submissions. R.Doc. 68 at 2.

## DISCUSSION

### A. *Use of the Best Information Available in Selection of the Surrogate*

■ Plaintiff claims Commerce improperly relied upon the best information available in selecting Thailand as the surrogate for the PRC in calculating foreign market value under 19 U.S.C. § 1677b(c). The statutory provisions relating to the calculation of foreign market value provide, *inter alia,:*

(1) [In nonmarket economy cases, Commerce] shall determine the foreign market value of the merchandise on the basis of the value of the factors of production utilized in producing the merchandise.... [T]he valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by [Commerce].

. . . . .

(4) [Commerce], in valuing the factors of production ..., shall utilize, to the extent possible, the prices or costs of factors in one or more market economy countries that are—

(A) at a level of economic development comparable to that of the nonmarket economy country....

19 U.S.C. § 1677b(c).

Plaintiff contends that while Commerce may use the best information available with respect to factors of production and their values in the surrogate, Commerce may not use the best information available in selecting a surrogate country. According to plaintiff, Commerce has the responsibility of independently selecting the proper surrogate.

The statute regarding the use of best information available provides:

In making their determinations under [Subtitle IV of the Tariff Act of 1930], [Commerce] and the Commission shall, whenever a party ... refuses or is unable to produce information requested in a timely manner and in the form required, or otherwise significantly impedes an investigation, use the best information otherwise available.

19 U.S.C. § 1677e(c) (1988).

In reviewing an agency's interpretation of a statute, "[i]f the statutory language is clear, then 'that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" *Chaparral Steel*

*Co. v. United States,* 901 F.2d 1097, 1101 (Fed.Cir.1990) (quoting *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984)). When the statute is not clear, and the agency has made an interpretation, the court must examine the agency's interpretation as to whether it is "based on a permissible construction of the statute." *Id.* It appears that since the selection of a surrogate under 19 U.S.C. § 1677b(c) is within Subtitle IV of the Tariff Act of 1930, the best information available provision applies to selection of a surrogate. Even if it was not clear, Commerce's application of the best information available provision to the selection of a surrogate in a nonmarket economy country review would be a permissible construction of the statute.

■ Plaintiff argues if the best information available provision applies to the choice of a surrogate, the statute clearly requires noncompliance with an information request. According to plaintiff, since Commerce only requested from the Chinese producers information concerning factors of production, there has not been a failure to comply with an information request concerning the selection of the surrogate, which would be a condition precedent to application of the best information available.

The court recognizes the best information available statute requires noncompliance with an information request before Commerce may resort to the best information available. *See Olympic Adhesives, Inc. v. United States,* 899 F.2d 1565, 1574 (Fed.Cir.1990). In this action, the Chinese respondents did not comply with Commerce's requests for information. By totally failing to respond to Commerce's questionnaires, the Chinese producers prevented Commerce from proceeding to conduct a surrogate investigation, which effectively "undermine[d] the administrative process and shift[ed] the burden of creating an adequate record from respondents to Commerce." *Chinsung Indus. Co. v. United States,* 13 CIT 103, 106, 705 F.Supp. 598, 601 (1989). Commerce's re-

liance upon the best information available in its selection of the surrogate was reasonable because Commerce may draw an adverse inference when respondents fail to cooperate. *Rhone Poulenc, Inc. v. United States,* 899 F.2d 1185 (Fed.Cir.1990) The Court of Appeals for the Federal Circuit has noted the best information available provision may be viewed as "an investigative tool, which the agency may wield as an informal club over recalcitrant parties or persons whose failure to cooperate may work against their best interest." *Atlantic Sugar, Ltd. v. United States,* 2 Fed.Cir. (T) 130, 134, 744 F.2d 1556, 1560 (1984). Plaintiff's reliance upon *Olympic Adhesives* is misplaced because that case involved Commerce's improper application of the best information available to a company which had provided information.

Plaintiff also contends that the best information available provision should not apply to the choice of a surrogate because foreign producers are in no better position to supply information about another country's economy than Commerce. The record does not indicate, however, whether Commerce is in a better position than the Chinese government to possess information concerning the economic condition of third countries.

**B.** *Whether the Selection of Thailand is Supported by Substantial Evidence*

Plaintiff claims Commerce made no assessment of Thailand's appropriateness as a surrogate "independent of the invidious reasoning that it was 'in a BIA situation,'" *Pl's Reply Br.* at 17, since Commerce stated in its final results that it "does not consider the comparability of Thailand and the PRC to be so disparate as to render Thailand an inappropriate surrogate for BIA purposes." 56 Fed.Reg. at 19,642. Plaintiff argues it was unreasonable for Commerce to select Thailand as the surrogate because an October 1990 memorandum of Commerce's Office of Policy omitted Thailand from a list of countries "most comparable" to the PRC in terms of per capita GNP, distribution of Labor and rate of economic growth. R.Doc. 40 at attachment 2. Plaintiff continues that since Thai-

land was listed as "most comparable" in a similar memorandum dated December 1989, this recent omission precludes Commerce from determining that Thailand is an appropriate surrogate.

 "Nothing in the best information rule or its legislative history defines a standard of investigative thoroughness." *Atlantic Sugar, Ltd.*, 2 Fed.Cir. (T) at 134, 744 F.2d at 1561. The court's role is not to determine whether the information chosen by Commerce is the "best" actually available, but whether the choice is supported by substantial evidence and is in accordance with law. *Manifattura Emmepi, S.p.A. v. United States*, 16 CIT ——, ——, 799 F.Supp. 110, 114 (1992); *Midland Export, Ltd. v. United States*, 16 CIT ——, ——, Slip Op. 92–53 at 8 n. 3, 1992 WL 78424 (Apr. 8, 1992). Substantial evidence is relevant evidence that "a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938). It is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966). Also, Commerce may exercise discretion in determining what is the best information available, *e.g.*, *Rhone Poulenc, Inc.*, 899 F.2d at 1190; *Chemical Prods. Corp. v. United States*, 10 CIT 626, 634, 645 F.Supp. 289, 295, *remand order vacated*, 10 CIT 819, 651 F.Supp. 1449 (1986), and information which Commerce may use includes information in the petition and submissions of interested parties. 19 C.F.R. § 353.37(b) (1992).

 The court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974). The 1990 memorandum is not binding upon Commerce. It is a recommendation that Commerce fo-

cus on six countries that are "most comparable" to the PRC, but notes that Thailand has been used in the past as a surrogate for the PRC. R.Doc. 40 at attachment 2. Commerce used Thailand as a surrogate for the PRC in *Industrial Nitrocellulose from the People's Republic of China*, 55 Fed.Reg. 21,051 (Dep't Comm. May 22, 1990) (final), which was published only five months before the preliminary results in this review. Thailand was also used as a surrogate in the investigation which resulted in the antidumping duty order under review. *Potassium Permanganate from the People's Republic of China*, 48 Fed. Reg. 57,347 (Dep't Comm.1983) (final). *See Barium Chloride from the People's Republic of China*, 53 Fed.Reg. 13,140 (Dep't Comm.1988) (prelim. admin. review) (Thailand used as surrogate). In addition, the record discloses that the World Bank places Thailand in the same economic classification as two of the countries listed in the 1990 memorandum. R.Doc. 62 at 23.

Under these circumstances, the Court finds Commerce's selection of Thailand as a surrogate was reasonable and supported by substantial evidence. "A [best information available] rate need not be a perfect rate; it is simply the rate Commerce finds most suitable in the particular circumstances, which is also supportable." *Smith Corona Corp. v. United States*, 16 CIT ——, ——, 796 F.Supp. 1532, 1536 (1992).

C. *Sales, General and Administrative Expenses*

 Plaintiff challenges Commerce's use of sales, general and administrative expenses for industries in the United States in calculating foreign market value. Plaintiff argues even if Commerce properly selected Thailand as the surrogate, in the absence of Thai data for sales, general and administrative expenses, Commerce should have applied the statutory minimum rate of 10%, 19 U.S.C. § 1677b(e)(1)(B)(i) (1988), because it is Commerce's practice to use the statutory minimum rate when proper surrogate information is inadequate.

**1038**

The determinations cited by plaintiff indicate, however, that Commerce has used the statutory minimum rate when the record contains no data for sales, general and administrative expenses, despite cooperation from the respondents. *See Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, from the Republic of Romania,* 56 Fed.Reg. 41,518, 41,520 (Dep't Comm.1991) (final admin. review); *Sparklers from the People's Republic of China,* 55 Fed.Reg. 51,743 (Dep't Comm. 1990) (final). When a respondent had only been partially cooperative, Commerce used data from a country considered less comparable to the economy under investigation than the surrogate and imposed a rate which exceeded the statutory minimum. *Antifriction Bearings (Other than Tapered Roller Bearings) and Parts Thereof from the Socialist Republic of Romania,* 56 Fed.Reg. 31,757 (Dep't Comm.1991) (final admin. review) (incorporating by reference comments 11 & 12 at 56 Fed.Reg. 31,739). The court notes that § 1677b(e)(1)(B)(i) only provides for a minimum rate for sales, general and administrative expenses. Since § 1677b(c) does not prohibit and Commerce's regulations provide that the United States may be used for surrogate pricing, 19 C.F.R. § 353.-52(b)(3) (1992), Commerce's use of U.S. industry data for sales, general and administrative expenses was reasonable in light of the respondents' total failure to cooperate and was supported by substantial evidence.

## CONCLUSION

It was reasonable for Commerce to use petitioner's data, with Thailand as the surrogate and U.S. industry rates for sales, general and administrative expenses, as the best information available because it is Commerce's practice to draw an adverse inference when respondents fail to cooperate.