MITSUBISHI HEAVY INDUSTRIES, LTD., Plaintiff,

v.

UNITED STATES, Defendant,

and

Goss Graphics, Inc., Defendant–Intervenor.

KOENIG & BAUER–ALBERT AG, Plaintiff,

v.

UNITED STATES, Defendant,

and

Goss Graphics, Inc., Defendant–Intervenor.

Slip Op. 97–153.
Court Nos. 96–10–02292, 96–10–02298.

United States Court of International Trade.

Nov. 19, 1997.

Steptoe & Johnson (Anthony J. LaRocca, Julia Court, and Richard O. Cunningham), Washington, DC, for Mitsubishi Heavy Industries, Ltd., Kirkland & Ellis (Kenneth G. Weigel and Nancy Kao), Washington, DC, for Koenig & Bauer–Albert AG and KBA–Motter Corp., for Plaintiffs.

Frank W. Hunger, Assistant Attorney General of the United States, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice; Of Counsel, Robert J. Heilferty and Boguslawa B. Thoemmes, Office of the Chief Counsel for Import Administration, Department of Commerce, and Randi–Sue Rimerman, Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, for Defendants.

Wiley, Rein & Fielding (Charles Owen Verrill, Jr., Alan H. Price, and Willis S. Martyn III), Washington, DC, for Defendant–Intervenors.

## OPINION

POGUE, Judge.

Plaintiffs, Mitsubishi Heavy Industries ("MHI") and Koenig & Bauer–Albert AG and KBA–Motter Corp. (collectively "KBA") move for judgment on the agency record pursuant to USCIT R. 56.2, challenging the United States Department of Commerce's ("Commerce") final antidumping determination. *See Large Newspaper Printing Presses & Components Thereof, Whether Assembled or Unassembled from Japan,* 61 Fed. Reg. 38,139 (Dep't. Commerce 1996) (final deter.) (*"Japan Final"*); *Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled from Germany,* 61 Fed.Reg. 38,166 (Dep't. Commerce 1996) (final deter.) (*"Germany Final"*). MHI and KBA object to Commerce's final scope determination, contending that it constitutes an impermissible expansion of the scope of the investigation, as defined in Commerce's *Notice of Initiation.*[1]

## BACKGROUND

Domestic producer Goss Graphics, Inc.[2] ("Goss") petitioned Commerce to investigate possible sales at less than fair value of "large newspaper printing presses ... and [five named] press components, whether assembled or unassembled," from Germany and Japan. The petition defined an unassembled press system, addition, or component as "any collection of ... constituent parts, imported for assembly into a press, press addition, or press component, and whether or not combined, ... with constituent parts or components from non-subject sources...." *See* Antidumping Petition, Public Version (June 30, 1995), Pub. Doc. No. 1, at 6–7.

MHI and other respondents challenged the petition, arguing that petitioner's definition of unassembled presses appeared to include parts or subcomponents of press systems and components and that petitioner had failed to identify the members of the U.S. industry that manufactured those parts or subcompo-

nents. In the *Notice of Initiation,* ITA addressed respondents' arguments:

> [W]e note that the subject merchandise defined in the scope section of this notice clarifies that the domestic like product identified in the petition is limited to large newspaper printing press systems, press additions, and the five named major press system components. The subcomponents and parts identified by MHI are not included in the definition of the domestic like product accepted by the department. As such, there is no issue with respect to domestic producers of printing press subcomponents or parts.

60 Fed.Reg. at 38,546.

The scope definition in the *Notice of Initiation* was based on the petition. However, to further clarify that parts and subcomponents were not included in the scope of the investigation, Commerce deleted petitioner's language referring to "constituent parts" of a component. Thus, Commerce defined the scope to include "complete LNPP's, additions, and the [five named] press components, regardless of degree of disassembly and/or degree of combination with non-subject elements before or after importation." *Id.* at 38,547. The parties disagreed on the meaning of this language and requested additional clarification on the scope of the investigation. *See Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, From Japan,* 61 Fed.Reg. 8,029, 8,031 (Dep't Commerce 1996) (prelim. determ.) (*"Japan Prelim."*); *Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, From Germany,* 61 Fed.Reg. 8,035, 8,037 (Dep't Commerce 1996) (prelim. determ.) (*"Germany Prelim."*).

In the preliminary determinations, Commerce "clarified the scope to include elements' (otherwise referred to as 'parts' or 'subcomponents') of an LNPP system, addition or component, *which taken as a whole, constitute a subject LNPP system, addition*

---

1.  *See Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, From Germany and Japan,* 60 Fed.Reg. 38,546 (Dep't. Commerce 1995) (notice of initiation).

2.  Goss filed the petition under its former name, Rockwell Graphic Systems, Inc.

*or component used to fulfill an LNPP contract."* *Japan Prelim.,* 61 Fed.Reg. at 8,030; *Germany Prelim.,* 61 Fed.Reg. at 8,036 (emphasis added). Commerce, however, had not defined when a collection of elements "constitutes" an LNPP component and invited comment from the parties. *See Japan Prelim.,* 61 Fed.Reg. at 8,031; *Germany Prelim.,* 61 Fed.Reg. at 8,037. In the final determinations, Commerce defined the scope of its investigation to include parts when those parts are imported to fulfill a contract for an LNPP system and constitute at least 50 percent of the value of the component into which they are incorporated.[3] MHI and KBA object to this definition.

## DISCUSSION

### I. SCOPE AND INDUSTRY SUPPORT

An antidumping investigation may be commenced in one of two ways: an interested party may file a petition alleging the elements necessary for imposition of an antidumping duty, 19 U.S.C. § 1673a(b); or Commerce may self-initiate an investigation. 19 U.S.C. § 1673a(a); 19 C.F.R. § 353.11 (1996). To initiate an investigation in response to a petition, Commerce must "determine whether the petition alleges the elements necessary for the imposition of a duty . . ." and "determine if the petition has been filed by or on behalf of the industry," i.e., whether the domestic industry supports the investigation. 19 U.S.C. § 1673a(c)(1)(A).

MHI and KBA argue that Commerce's clarification of the initial scope determination was unlawful under the antidumping statute as amended by the Uruguay Round Agreements Act of 1994 ("URAA").[4] Specifically, plaintiffs argue that Commerce's discretion to change the scope of an investigation is limited by amendments to the statutory provisions governing the determination of industry support.

Before the URAA took affect, Commerce could presume industry support unless a petition was actively opposed. *See NTN Bearing Corp. v. United States,* 15 CIT 75, 79, 757 F.Supp. 1425, 1429 (1991). Now, Commerce may not operate on the basis of the presumption, but rather must establish that:

(i) the domestic producers or workers who support the petition account for at least 25 percent of the total production of the domestic like product, and

(ii) the domestic producers or workers who support the petition account for more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for or opposition to the petition.

19 U.S.C. § 1673a(c)(4)(A) (1994). This determination must be concluded within 20 days of the filing of the petition. 19 U.S.C. § 1673a(c)(1)(A). The URAA also says that "[a]fter [Commerce] makes a determination with respect to initiating an investigation, the determination regarding industry support shall not be reconsidered." 19 U.S.C. § 1673a(c)(4)(E) (1994).[5]

MHI and KBA argue that "[t]he definition of the domestic industry is tied to the definition of the domestic like product, which is defined in terms of the subject merchandise." (Mot. of Pls. Mitsubishi Heavy Industries, Ltd., Koenig & Bauer–Albert AG and KBA–Motter Corp. J. Agency Rec. on Scope and Standing Issues (Pls.' Mem.) at 16 n. 61 (citing 19 U.S.C. § 1677(4)(A) (definition of domestic industry)); 19 U.S.C. § 1677(10) (definition of domestic like product)). Therefore, "under the new statute ITA must define

---

**3.** Commerce defined the scope of its investigation as follows:

> Any of the five components, the use of which is to fulfill a contract for large newspaper printing press systems, press additions, or press components, . . . is included in the scope of this investigation. Also included in the scope are elements of a LNPP system, addition or component, which taken altogether, constitute at least 50 percent of the cost of manufacture of any of the five major LNPP components of which they are a part.

*Germany Final,* 61 Fed.Reg. at 38,169–70.

**4.** Pub.L. No. 103–465, 108 Stat. 4843 (1994).

**5.** Prior to the URAA, parties could challenge Commerce's industry support determination late in the investigation. *See Tianjin Mach. Import & Export Corp. v. United States,* 16 CIT 931, 806 F.Supp. 1008 (1992) (permitting respondents to challenge Commerce's industry support determination two weeks before final determination).

the scope of the investigation prior to initiation so that it can determine whether the industry making the products included in the scope support the initiation of an investigation." *Id.* at 16. Plaintiffs also argue, "the scope cannot be expanded as the investigation proceeds because industry support for a new scope cannot be considered after initiation." *Id.* Thus, according to plaintiffs, the issue before the Court is Commerce's ability under the URAA to expand the scope of an investigation after initiation. However, the Court need not reach this issue because the Court finds that Commerce did not expand the scope.[6]

In reviewing a final determination, the Court must decide whether Commerce's determination is in accordance with law and whether Commerce's conclusions are supported by substantial evidence on the record. Section 516A(b)(1)(B)(i) of the Tariff Act of 1930, 19 U.S.C. § 1516a(b)(1)(B)(i) (1994).

■■■ Certainly if the words of the URAA are to have meaning, they must create a duty to define the domestic like product with enough specificity to conduct a meaningful industry support analysis. Here, the Court finds the steps taken by Commerce were sufficient to define the domestic like product with the requisite degree of specificity and thus to conduct a meaningful industry support analysis. Therefore, Commerce's scope definition was in accordance with its obligations under the URAA.

Commerce based its initial definition of domestic like product on Goss's petition, according to its usual practice. *See Kern–Liebers USA, Inc. v. United States,* 881 F.Supp. 618, 621 (CIT 1995) ("[T]he agency generally exercises [its] broad discretion to define and clarify the scope of an antidumping investigation in a manner which reflects the intent of the petition.'") (quoting *Minebea Co. v. United States,* 16 CIT 20, 22, 782 F.Supp. 117, 120 (1992), aff'd on other grounds, 984 F.2d 1178 (Fed.Cir.1993)).

Goss's petition included within the suggested scope of the investigation, LNPP systems, additions and the named components whether assembled or unassembled. *See* Antidumping Petition, Public Version (June 30, 1995), Pub. Doc. No. 1, at 6–7. Commerce met with Goss's legal counsel to discuss the meaning of the term "component" as used in the petition. P.R. 15, Ex. 5. Goss then clarified that the term "component" specifically referred to the five components subsequently named in Commerce's preliminary and final determinations.

■■■ Commerce's definition of the subject merchandise in the notice of initiation did not finally resolve the issue of when incomplete merchandise—made up of unassembled parts—would constitute a component. Commerce's definition did, however, clearly include unassembled components used to fulfil an LNPP contract and the industry support determination was based on this definition. Because the statute gives Commerce only 20 days to make its industry support determination it would not be reasonable for the Court to demand absolute finality in the definition of unassembled components at such an early stage in the investigation.

Given the time limits imposed on Commerce's initiation decision and the fact that no domestic producer expressed opposition to the petition, the Court finds that the procedures Commerce followed constituted a reasonable application of the statute and therefore, that the scope definition upon which it based its industry support determination was in accordance with law.

In addition, in framing its final scope definition, Commerce responded to concerns that the inclusion of incomplete merchandise would "conflict with the Department's industry support determination," *Germany Final,* 61 Fed.Reg. at 35,168, by taking steps to ensure that elements that did not amount to an LNPP system, component or addition would not be assessed with antidumping duties. These steps included tying the imported elements to LNPP contracts, the provision of certifications,[7] and the exclusion of

---

**6.** This case does not involve the question whether Commerce may contract the scope of an investigation.

**7.** Under the Department's certification procedure, German and Japanese producers/exporters and U.S. importers in the LNPP industry are given the opportunity to certify that imported

spare parts. Thus only elements used to produce an LNPP component are within the scope of the investigation.

Plaintiffs have produced no evidence that would indicate that Commerce's clarification expanded the definition of the domestic like product so as to include producers not considered in the industry support determination. In the absence of such evidence, the Court concludes that Commerce's scope clarification was consistent with the statute as amended by the URAA.

## II. EXPANSION OF SCOPE

MHI and KBA also argue that "ITA violated its established practice by expanding the scope of the investigation ... after the investigation had begun," and that "ITA and the CIT have consistently found that scope expansions made late in an investigation are improper...." (Pls.' Mem. at 19). Furthermore, plaintiffs argue, "late scope expansions hinder ITA's ability to obtain evidence, to receive comments from parties which may be affected by a revision of the scope of [the] investigation, and to allow the Department sufficient time to consider the issue.'" (Pls.' Mem. at 21) (quoting *Personal Word Processors from Japan,* 56 Fed.Reg. 31,303, 31,-104 (Dep't. Commerce 1991) (final deter.)).

■ "Commerce, retains broad discretion to define and clarify the scope of an antidumping investigation in a manner which reflects the intent of the petition." *Minebea Co. v. United States,* 16 CIT 20, 22, 782 F.Supp. 117, 120 (1992) (upholding as supported by substantial evidence scope clarification made after notice of initiation). This discretion is limited by the requirement that it be exercised reasonably and that any consequent determination be supported by substantial evidence in the administrative record. *See Minebea,* 16 CIT at 22, 782 F.Supp. at 119. Commerce's discretion also is limited by concerns for finality of administrative action. *See Smith Corona v. United States,* 16 CIT 562, 565, 796 F.Supp. 1532, 1535 (1992) ("Commerce, however, must exercise caution in redefining scope in midstream to include

elements will not be used to fulfill an LNPP contract. (Final Scope Mem. at 17, July 15,

items which were clearly known about and excluded at the time of initiation of the investigation...."

As the Court explained above, the scope definition articulated in both the petition and Commerce's *Notice of Initiation*—and used in the industry support analysis—included LNPP systems, additions, and five components. In the Preliminary Determination, Commerce left open only the question of when an assembly of parts became equivalent to an LNPP component. Commerce explained its decision to include a collection of elements that represented something less than one hundred percent the parts of an LNPP system, component or addition, as follows:

[I]t was the Department's intent to use the language at issue to avoid creating loopholes for circumvention, including those arising from differing degrees of completeness of the imported merchandise. The Department is concerned that, because of the great number of parts involved, there is the potential that a party may attempt to exclude its merchandise from the scope of these investigations on the basis of a lack of completion.

*Germany Final,* 61 Fed.Reg. at 38,169.

According to *Mitsubishi Elec. Corp. v. United States,* 12 CIT 1025, 1042, 700 F.Supp. 538, 552 (1988), "[T]he ITA has a certain amount of discretion to expand the language of a petition to encompass the literal intent of the petition, ... with the purpose in mind of preventing the intentional evasion or circumvention of the antidumping duty law." *aff'd,* 898 F.2d 1577 (Fed.Cir.1990).

Furthermore, although the petition did not specifically refer to incomplete LNPPs, additions and components, Commerce's language reflects the intent of the petition and *Notice of Initiation* which covered "[a]ny of the five components, or collection of components, the use of which is to fulfill a contract for large newspaper printing press systems, press additions, or press components, regardless of degree of disassembly, and/or degree of com-

1996 (P.R. 505)).

bination with non-subject elements before or after importation...." 60 Fed.Reg. 38,547.

In making its clarification, Commerce tied the subject merchandise to a contract for the sale of an LNPP system, addition or component thus ensuring that elements that did not amount to an LNPP system or component would not be assessed with antidumping duties. Commerce's scope clarification represents a reasonable attempt by Commerce to balance respondents' concerns for finality and the fairness of Commerce's investigation, with the statutory duty to issue an effective and administrable antidumping duty order. *See Mitsubishi,* 12 CIT at 1046–47, 700 F.Supp. at 555–56 (1988).

■ Plaintiffs argue that in *Bicycles from the People's Republic of China,* 61 Fed.Reg. 19,026, 19,027 (Dep't. Commerce 1996) (final determ.) Commerce defined unassembled to mean fully or partially unassembled, and incomplete to mean lacking one or more parts or components. Because the *Bicycles from China* case defined "unassembled" and "incomplete" as separate concepts, plaintiffs contend, the definitions are mutually exclusive. Thus, plaintiffs conclude, Commerce cannot now define an *unassembled* component to include a group of parts that constitute something less than a complete component (i.e., an incomplete component). (Tr. Aug. 20, 1997 Hr'g. at 55–56). However, in *Professional Electric Cutting Tools from Japan,* 62 Fed.Reg. 386, 387 (Dep't. Commerce 1997) (final results admin. review), Commerce defined unassembled to include "components which, when taken as a whole, ... can be converted into the finished or unfin-

ished or incomplete tool...." Because Commerce has not consistently interpreted the two terms as being mutually exclusive, the Court cannot accept respondents' argument. Consequently, Commerce's inclusion of incomplete merchandise within the scope of its investigation represents a permissible interpretation of the language in the *Notice of Initiation.*

## III. THE 50–PERCENT VALUE TEST

■ Plaintiffs also object to Commerce's 50–percent value test arguing that neither the antidumping statute nor the regulations "provide ITA with authority to define 50 percent of a product as the equivalent of the finished product." (Pls.' Mem. at 24).[8] Furthermore, plaintiffs argue, "[i]n the customs area it is well established that an incomplete or unfinished article can be classified the same as the complete article only if it has the 'essential character' of the complete article." (Pls.' Mem. at 25) (citing General Rule of Interpretation 2(a) of the Harmonized Tariff Schedule of the United States (1997)).

■ The antidumping statute defines subject merchandise as "the class or kind of merchandise that is within the scope of an investigation, a review, a suspension agreement, an order ... or a finding under the Antidumping Act, 1921." 19 U.S.C. § 1677(25). The statute does not specify when a collection of parts rises to the level of subject merchandise. "If the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*

8. Plaintiffs also argue that Commerce's 50–percent test violates the antidumping statute because the importer cannot determine at the time of entry whether imported LNPP parts are within the scope of Commerce's antidumping duty order. (Pls.' Mem. at 27). The Court does not agree. Commerce's scope definition includes LNPP systems, five named components and additions. Commerce's decision to define LNPP systems, components and additions to include parts constituting at least 50 percent of the value of the component into which they are incorporated was a permissible exercise of Commerce's discretion. There is nothing in the statute that requires a conclusive scope determination at the time of importation.

Plaintiffs' contention that Commerce's 50 percent test is inconsistent with the GATT panel decision in the Swedish antidumping duties case is similarly unconvincing. In that case, the Italian government complained about Sweden's imposition of dumping duties on nylon stockings. Specifically, the Italian government objected to the Swedish government's practice of imposing dumping duties on producers who were selling below a certain price without first conducting an investigation to see whether the producers were actually dumping. *See Swedish Anti–Dumping Duties,* Feb. 23, 1955, GATT B.I.S.D., (3d Supp.) at 81. In this case, Commerce's dumping determination was made after a full investigation. Thus, the Swedish anti-dumping case is inapposite.

*U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Here, Commerce was choosing between two tests, an essence test[9] and a value test. Commerce chose the value test because given the complexity of the subject merchandise, and the large number of parts involved, it was not possible for Commerce "to reduce the 'essence' definition to a single, non-contradictory definition." *Germany Final* at 38,169. The complexity of the subject merchandise and large number of parts involved are well documented. Thus, Commerce's rejection of the essence test in favor of the value test is supported by substantial evidence.

Having decided to include incomplete components within the scope of its investigation, and having rejected the essence test in favor of a value test, Commerce was obliged to choose a number to make its order administrable. The nature of this choice made a certain degree of randomness unavoidable. It is difficult, for example, to distinguish between 50 percent and 49 percent, or between 50 percent and 51 percent. This difficulty was exacerbated by the complexity of the subject merchandise as well as the large number of parts involved.

9. Use of the essence test would require authorities to consider, on a case-by-case basis, whether imported parts or subcomponents when taken together are "essentially a LNPP system, addition or component." *Germany Final,* 61 Fed. Reg. at 38,168. "The essence approach ... seeks, in principle, to capture what a particular subject LNPP component actually is—*i.e.* the 'heart' of it." *Id.* at 38,169.

10. Goss argues that Commerce should have included in *its* investigation, a sale by Man Roland of a lower folder to the []. (Goss Graphic Systems, Inc. Mot. J. Agency Rec. at 1). KBA and Man Roland argue that the [] sale was outside the scope of the investigation. A folder is one of the five named press components included within the scope of the investigation. In the final scope determination, a folder is defined as "a module *or combination of modules* capable of cutting, folding and/or delivering the paper from a roll or rolls of newspaper broadsheet paper more than two pages in width into a newspaper format." *Germany Final* at 38,167 (emphasis added) Thus, a folder may consist of a single subcomponent or "module" or several modules, depending on the design of the specific LNPP.

■ In order to make its choice, Commerce did exactly what an agency is required to do, "reason its way to a decision without pretending that that decision reflected some degree of rational perfection...." *See Fishermen's Dock Coop. Inc. v. Brown,* 75 F.3d 164, 173 (4th Cir.1996). "Where the agency's line-drawing does not appear irrational and the [plaintiff] has not shown that the consequences of the line-drawing are in any respect dire ... we will leave that line-drawing to the agency's discretion." *Leather Industries v. Environmental Protection Agency,* 40 F.3d 392, 409 (D.C.Cir.1994).

■ Commerce has offered a rational explanation for choosing the value test over the essence test, describing the value test as "consistent, predictable, and administrable," and for setting the threshold at 50 percent. *See Germany Final,* 61 Fed.Reg. at 38,169. Specifically, Commerce concluded that this threshold would assure that the combination of parts was significant enough to "capture" elements critical to the component. *Id.* at 38,170. Plaintiffs have failed to produce evidence to show any dire consequences of Commerce's choice. Therefore, the Court finds that Commerce's 50–percent value test constitutes a reasonable method for defining the point at which a collection of parts constitute the equivalent of a component.[10]

Goss interprets the definition of a folder to mean that a single module may be considered to be a folder even if the folder in the particular press system is comprised of several modules. Although it does not say so explicitly, Commerce interprets the scope language to mean that a single module may be considered a folder only if that module comprises 50 percent or more of the cost of manufacturing the entire folder. The Court finds Commerce's interpretation of the scope language to be consistent with the 50–percent value test and with Commerce's goal of excluding nonsubject parts and subcomponents from the scope of this investigation. Therefore, the Court will defer to Commerce's interpretation. *See Minebea,* 16 CIT at 22, 782 F.Supp. at 119.

Commerce's decision to exclude the [] sale also was supported by substantial evidence. The [] press system folder comprised four types of modules: a lower folder, delivery system, lower former, and upper (balloon) former. Commerce investigators found that the value of the lower folder purchased from Man Roland was less than 50 percent of the value of the entire folder. The record contains ample documentation to support this finding. *See* Commerce Mem. of July 15,

## IV. ITA'S SUSPENSION OF LIQUIDATION INSTRUCTIONS

Respondents' contention that Commerce's suspension of liquidation instructions are invalid is equally without merit. Plaintiffs argue that ITA's suspension of liquidation instructions will suspend liquidation of both subject and non-subject merchandise. "The antidumping statute ... authorizes suspension of liquidation only of merchandise subject to the determination' and the posting of a cash deposit, bond, or other security only for entries of subject merchandise.' Accordingly, entries of *nonsubject* merchandise cannot have their liquidation suspended by the order." (Pls.' Mem. at 33).

■ However, as the Court said above, there is nothing in the statute that requires a conclusive scope determination at the time of importation. *See* n. 8. Furthermore, by suspending liquidation only of parts that are tied to an LNPP contract, and providing the opportunity to certify that parts are not tied to an LNPP contract, Commerce took reasonable steps to prevent the suspension of liquidation of nonsubject merchandise. Thus Commerce's suspension of liquidation instructions were in accordance with law.

## CONCLUSION

Commerce's scope clarification was in accordance with law, supported by substantial evidence, and does not raise concerns about finality of administrative action. For these reasons, Commerce's decision to include within the scope of its investigation, elements of an LNPP system, addition, or component, which taken together, constitute at least 50 percent of the cost of manufacture of any of the five major LNPP components of which they are a part is sustained.

1996, re: Constructed Value, Further Manufacturing and Constructed Export Price Adjustments for Final Determination, Worksheet 7.

Because Commerce's decision to exclude the [ ] sale was reasonable and supported by substantial evidence, the decision is sustained.