Slip Op. 04–59

# UNITED STATES COURT OF INTERNATIONAL TRADE

_____

|  |  |  |
|---|---|---|
| | : | |
| ALLEGHENY BRADFORD | : | |
| CORPORATION, d/b/a TOP LINE | : | |
| PROCESS EQUIPMENT COMPANY, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Court No. 02-00073 |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |

_____ :

[Antidumping duty order scope determination reversed.]

Dated:  June 4, 2004

Womble Carlyle Sandridge & Rice PLLC (James K. Kearney) for plaintiff.

Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, Jeanne E. Davidson, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (David S. Silverbrand, James H. Holl, III, and Paul D. Kovac), Philip J. Curtin, Attorney, Office of Chief Counsel for Import Administration, United States Department of Commerce, Christopher Chen, Senior Attorney, Office of Chief Counsel, United States Bureau of Customs and Border Protection, of counsel, for defendant.

## <u>OPINION</u>

**RESTANI, Chief Judge:**

### INTRODUCTION

Plaintiff Allegheny Bradford Corporation, d/b/a Top Line Process Equipment Company

("Top Line") moves for judgment on the agency record that its stainless steel butt-weld tube

fittings from Taiwan were improperly ruled to be within the scope of an antidumping duty order by the U.S. Department of Commerce ("Commerce" or "Department").  Final Scope Ruling on the Antidumping Duty Order on Stainless Steel Butt-Weld Pipe Fittings from Taiwan: Allegheny Bradford Corporation d/b/a Top Line Process Equipment (Dep't Commerce Dec. 10, 2001), P.R. 29:13:33, Pl.'s App., Doc. 1, notice published at 66 Fed. Reg. 65,899 (Dep't Commerce Dec. 21, 2001) [hereinafter Final Affirmative Scope Ruling].  The underlying antidumping duty order imposed duties on stainless steel butt-weld pipe fittings from Taiwan.  Amended Final Determination and Antidumping Duty Order: Certain Welded Stainless Steel Butt-Weld Pipe Fittings from Taiwan, 58 Fed. Reg. 33,250 (Dep't Commerce June 16, 1993) [hereinafter Antidumping Duty Order or Order].  Because its tube fittings are unambiguously outside the scope of the Antidumping Duty Order, Top Line's motion is granted.

**BACKGROUND**

### I.     THE ANTIDUMPING DUTY INVESTIGATION

The Antidumping Duty Order was the culmination of an investigation initiated by the petition of the Flowline Division of Markovitz Enterprises.  Petition (May 20, 1992), P.R. 1:3:14-18,[1] Pl.'s App., Doc. 3, Ex. 4 [hereinafter Petition].  The petition alleged unfair imports of stainless steel butt-weld pipe fittings with an inside diameter of under fourteen (14) inches from Taiwan and the Republic of Korea.  Petition, at 1, P.R. 1:3:14, Pl.'s App., Doc. 3, Ex. 4 at 1. Over the course of several pages, the petition describes the subject merchandise as follows:

- classifiable under heading 7307.23 of the Harmonized Tariff Schedule;
- designated under heading A403/A403M–1991 of the standards developing

---

[1]"P.R. __:__:__ " refers to the public record document number, micro-fiche slide number, and micro-fiche frame number.

organization, ASTM;

- having American National Standards Institute ("ANSI") dimensional specifications B16.9–1986 and B16.28–1986;
- including finished or unfinished fittings capable of meeting these specifications
- excluding "threaded, grooved, and bolted fittings;"
- "used to connect pipe sections in piping systems where conditions require welded connections, as distinguished from fittings designed for other fastening methods (e.g., threaded, grooved, or bolted fitting);"
- "used where one or more of the following conditions is a factor in designing the piping system: (1) corrosion of the piping system will occur if material other than stainless steel is used; (2) contamination of the material in the system by the system itself must be prevented; (3) high temperatures (in excess of 300° F) are present; (4) extreme low temperatures are present; (5) high pressures are contained within the system;"
- "used in so-called 'process' piping systems such as chemical plants, foot processing facilities, breweries, cryogenic plants (including basic oxygen steel processing), waste treatment facilities, pulp and paper production facilities, gas processing (gas separation) facilities, and commercial nuclear power plants and nuclear navy applications (in reactor lines and water lines);"
- coming in "several basic shapes: 'elbows', 'tees', 'reducers', 'stub ends' and caps';"
- having edges that, for finished fittings, "are beveled so that when placed against the end of a pipe (the ends of which have also been beveled) a shallow channel is created to accommodate the 'bead' of the weld which joins the fittings to the pipe"

Id. at 1–4, Pl.'s App., Doc. 3, Ex. 4 at 1–4.

Working from Flowline's product description, Commerce formulated the antidumping investigation's scope in its notice of initiation:

The products subject to these investigations are stainless steel butt-weld pipe fittings, whether finished or unfinished, under 14 inches inside diameter.

Stainless steel butt-weld pipe fittings are used to connect pipe sections in piping systems where conditions require welded connections. The subject merchandise is used where one or more of the following conditions is a factor in designing the piping system: (1) Corrosion of the piping system will occur if material other than stainless steel is used; (2) contamination of the material in the system by the system itself must be prevented; (3) high temperatures are present; (4) extreme

low temperatures are present; (5) high pressures are contained within the system.

Stainless steel butt-weld pipe fittings come in a variety of shapes, with the following five shapes the most basic:  "elbows", "tees", "reducers", "stub ends", and "caps".  The edges of finished fittings are beveled. Threaded, grooved, and bolted fittings are excluded from these investigations. The stainless steel butt-weld pipe fittings subject to these investigations are classifiable under subheading 7307.23.00 of the Harmonized Tariff Schedule of the United States (HTSUS).

Initiation of Antidumping Duty Investigations: Certain Stainless Steel Butt-Weld Pipe Fittings from the Republic of Korea and Taiwan, 57 Fed. Reg. 26,645 (Dep't Commerce June 15, 1992) [hereinafter Notice of Initiation of Investigation].  When Commerce issued its preliminary determination roughly six months later, the scope language underwent minor changes, which consisted primarily of the addition of the word "certain" in its reference to the pipe fittings:

The products subject to this investigation are certain stainless steel butt-weld pipe fittings, whether finished or unfinished, under 14 inches inside diameter.

Certain stainless steel butt-weld pipe fittings (pipe fittings) are used to connect pipe sections in piping systems where conditions require welded connections. The subject merchandise is used where one or more of the following conditions is a factor in designing the piping system:

(1) Corrosion of the piping system will occur if material other than stainless steel is used;
(2) Contamination of the material in the system by the system itself must be prevented;
(3) High temperatures are present;
(4) Extreme low temperatures are present;
(5) High pressures are contained within the system.

["Stainless steel butt-weld" deleted] Pipe fittings come in a variety of shapes, with the following five shapes being the most basic: "elbows", "tees", "reducers", "stub ends", and "caps".  The edges of finished fittings are beveled.  Threaded, grooved, and bolted fittings are excluded from these investigations.  The pipe fittings subject to these investigations are classifiable under subheading 7307.23.00 of the

Harmonized Tariff Schedule of the United States (HTSUS).

Although the HTSUS subheading is provided for convenience and customs purposes, our written description of the scope of this investigation is dispositive.

Preliminary Determination of Sales at Less Than Fair Value: Certain Stainless Steel Butt-Weld Pipe Fittings From Taiwan, 57 Fed. Reg. 61,047 (Dep't Commerce Dec. 23, 1992) [hereinafter Preliminary Determination] (emphasis added to show changes from Notice of Initiation of Investigation).

The Final Determination nearly duplicated the scope language of the Preliminary Determination, with the addition, however, of two paragraphs regarding A774 fittings:

> The products subject to this investigation are certain stainless steel butt-weld pipe fittings, whether finished or unfinished, under 14 inches inside diameter.
>
> Certain welded stainless steel butt-weld pipe fittings (pipe fittings) are used to connect pipe sections in piping systems where conditions required welded connections. The subject merchandise is used where one or more of the following conditions is a factor in designing the piping system: (1) Corrosion of the piping system will occur if material other than stainless steel is used; (2) contamination of the material in the system by the system itself must be prevented; (3) high temperatures are present; (4) extreme low temperatures are present; (5) high pressures are contained within the system.
>
> Pipe fittings come in a variety of shapes, with the following five shapes the most basic: "elbows", "tees", "reducers", "stub ends", and "caps". The edges of finished pipe fittings are beveled. Threaded, grooved, and bolted fittings are excluded from these investigations. The pipe fittings subject to these investigations are classifiable under subheading 7307.23.00 of the Harmonized Tariff Schedule of the United States (HTSUS).
>
> Although the HTSUS subheading is provided for convenience and customs purposes, our written description of the scope of these investigations is dispositive.
>
> After it withdrew from this investigation, [Tachia Yung Ho Machine Co., Ltd.]

> inquired whether A774 type stainless steel pipe fittings were included within the scope of the investigation, and therefore, subject to any antidumping duty order.
>
> Based on the information on the record, we determine that A774 is covered by the scope of this investigation because it meets the requirements outlined in our scope. Our scope states that fittings must be under 14 seconds in inside diameter and can be either finished or unfinished. Our scope language only specifically excludes threaded, bolted and grooved fittings, and none of these criteria apply to A774 fittings. Therefore, we determine that A774 fittings are included in the scope of this investigation. (See "Concurrence Memorandum", dated May 7, 1993 for further discussion).

Final Determination of Sales at Less than Fair Value: Certain Stainless Steel Butt-Weld Pipe Fittings From Taiwan, 58 Fed. Reg. at 28,556 (Dep't Commerce May 14, 1993) [hereinafter Final Determination] (emphasis added to show changes from Preliminary Determination). The additional section regarding A774 fittings refers to the Concurrence Memorandum, which explains how the non-beveled A774 fittings could be included within the investigation's scope: "The scope does state the edges of finished fittings are beveled; however, this is not a requirement nor is this stated with respect to unfinished fittings. Finally, our scope language only specifically excludes threaded, bolted and grooved fittings, and none of these criteria apply to A774 fittings." Concurrence Memorandum to Final Determination (Dep't Commerce May 7, 1993) at issue 3, P.R. 1: 4:66–67, Pl.'s App., Doc. 3, Ex. 11 at 4 [hereinafter Concurrence Memorandum].

## II.     THE COMMISSION'S INJURY INVESTIGATION

Concurrent with Commerce's dumping investigation, the International Trade Commission ("ITC" or "Commission") instituted its injury investigation on December 17, 1992. In providing notice of the initiation of its injury investigation, the ITC gave only a brief

description of the subject merchandise as "certain stainless steel butt-weld pipe fittings, provided

for in subheading 7303.23.00 of the [HTSUS]."  Certain Stainless Steel Butt-Weld Pipe Fittings

from Korea and Taiwan:  Institution and Scheduling of Preliminary Antidumping Investigations,

57 Fed. Reg. 22,486 (Int'l Trade Comm'n May 28, 1992).  Later, on June 3, 1993, the ITC

transmitted to Commerce its final affirmative determination that a U.S. industry was materially

injured by less than fair value imports of stainless steel butt-weld pipe fittings from Taiwan.

Certain Stainless Steel Butt-Weld Pipe Fittings From Taiwan, USITC Pub. 2641, Inv. No.

731-TA-564 (final) (June 1993) at *1 [hereinafter Final Injury Determination].  The Final Injury

Determination defined the scope of the investigation by incorporating the Commission's product

discussion in Certain Stainless Steel Butt-Weld Pipe Fittings from Korea, USITC Pub. 2601, Inv.

No. 731-TA-563 (final) (Feb. 1993) [hereinafter Korea Final Injury Determination].  The product

description in the Korea Final Injury Determination begins as follows:

> Stainless steel butt-weld pipe fittings are used to connect pipe sections where
> conditions require permanent, welded connections and resistance to corrosion or
> oxidation and extreme temperatures as well as the ability to withstand pressure.
> The beveled edges of butt-weld fittings distinguish them from other types of pipe
> fittings, such as threaded, grooved, or bolted fittings, which rely on different
> fastening methods.  When placed against the end of a beveled pipe or another
> fitting, the beveled edges form a shallow channel that accommodates the "bead"
> of the weld that fastens the two adjoining pieces.

Id. at *27–*28.

## III.    THE ANTIDUMPING ORDER

After the ITC made its affirmative injury determination and Commerce issued the Final

Determination, the Department issued the definitive scope language in the Final Antidumping

Order. The Order altered the final paragraph of the Final Determination to couch the A774

ruling in the past tense and removed the reference to the Department's Concurrence

Memorandum:

> The products subject to this investigation are certain stainless steel butt-weld pipe
> fittings, whether finished or unfinished, under 14 inches inside diameter.
>
> Certain welded stainless steel butt-weld pipe fittings (pipe fittings) are used to
> connect pipe sections in piping systems where conditions require welded
> connections. The subject merchandise is used where one or more of the following
> conditions is a factor in designing the piping system: (1) Corrosion of the piping
> system will occur if material other than stainless steel is used; (2) contamination
> of the material in the system by the system itself must be prevented; (3) high
> temperatures are present; (4) extreme low temperatures are present; (5) high
> pressures are contained within the system.
>
> Pipe fittings come in a variety of shapes, with the following five shapes the most
> basic: "elbows", "tees", "reducers", "stub ends", and "caps". The edges of finished
> pipe fittings are beveled. Threaded, grooved, and bolted fittings are excluded from
> these investigations. The pipe fittings subject to these investigations are
> classifiable under subheading 7307.23.00 of the Harmonized Tariff Schedule of
> the United States (HTSUS).
>
> Although the HTSUS subheading is provided for convenience and customs
> purposes, our written description of the scope of these investigations is
> dispositive.
>
> After it withdrew from this investigation, Tachia Yung Ho Machine Industry Co.,
> Ltd. (TYH) inquired whether A774 type stainless steel pipe fittings were included
> within the scope of the investigation, and therefore, subject to any antidumping
> duty order.
>
> Based on the information on the record, we determined in our final determination
> that A774 is covered by the scope of this investigation because it meets the
> requirements outlined in our scope. Our scope states that fittings must be under
> 14" ["seconds" deleted] in inside diameter and can be either finished or
> unfinished. Our scope language only specifically excludes threaded, bolted and
> grooved fittings, and none of these criteria apply to A774 fittings. Therefore, we
> determined that A774 fittings are included in the scope of this investigation.
> ["(See 'Concurrence memorandum', dated May 7, 1993 for further discussion)."
> deleted]

Antidumping Duty Order, 58 Fed. Reg. at 33,250 (emphasis added to show changes from Final

Determination).

IV.    TOP LINE'S FIRST REQUEST FOR A SCOPE DETERMINATION

Top Line did not participate in the pre-antidumping order investigations by Commerce and the ITC, and did not participate in Commerce's administration of the Final Antidumping Order.  Top Line did, however, approach Commerce on December 14, 1994, requesting a scope ruling as to whether its various stainless steel tube fittings with non-welded ends are covered by the Final Antidumping Order.  Letter from Reed Smith to Secretary of Commerce (Dec. 14, 1994), P.R. 4:5:44, Pl.'s App., Doc. 4, Ex. 14 [hereinafter First Scope Request].  Commerce ruled for Top Line after an initial investigation, concluding that "no formal inquiry is warranted to determine whether bevel seat fittings, clamp fittings, valves, hangers, and flanges are outside the scope of [the Final Antidumping Order]."  Final Scope Ruling: Antidumping Duty Order on Stainless Steel Butt-Weld Pipe Fittings from Taiwan- Request of Top Line Process Equipment Corporation, (Dep't Commerce Aug. 8, 1994), at 2, P.R. 1:4:76, Pl.'s Appx., Doc. 3, Ex. 12 at 2, notice published at 60 Fed. Reg. 54,213 (Dep't Commerce Oct. 20, 1995) [hereinafter First Scope Ruling].

V.    TOP LINE'S SECOND SCOPE REQUEST

Several years after the First Scope Ruling, Top Line received from Customs a Notice of Action, dated March 8, 2001, informing the company that an entry of its "stainless steel butt weld pipe fittings" was subject to antidumping duties and requesting a cash deposit on the entry within 30 days.  Notice of Action (Mar. 8, 2001), P.R. 1:3:11, Pl.'s App., Doc. 3, Ex. 3.  Top Line

responded the following month by filing with Commerce a second scope request, which sought a ruling as to whether the Antidumping Duty Order covers its sanitary/hygienic stainless steel butt-weld tube fittings imported from King Lai International Co., Ltd. ("King Lai") of Taiwan.  Letter from Reed Smith to Secretary of Commerce (Apr. 12, 2001), at 1, P.R. 1:2:1, Pl.'s App., Doc. 3 [hereinafter Second Scope Request].[2]

In the Second Scope Request, Top Line alleged that its sanitary/hygienic stainless steel butt-weld tube fittings should be excluded from the Final Antidumping Order because: (1) while stainless steel pipe, the subject of the Final Antidumping Order, is always designated by inside diameter, stainless steel tubing, King Lai's product, is always designated by outside diameter; (2) King Lai's sanitary/hygienic stainless steel butt-weld tube fittings do not meet the specific and objective criteria for stainless steel butt-weld pipe fittings, as set forth in the Petition; (3) King Lai's tube fittings are manufactured and used in different ways than the pipe fittings described in the Final Antidumping Order; and (4) King Lai's sanitary/hygienic stainless steel butt-weld tube fittings are square cut, not beveled.  Second Scope Request, at 5–6, Pl.'s App., Doc. 3 at 5–6.

Responding to the Second Scope Request, a group of manufacturers—including Flowline, Gerlin, Inc., Shaw Alloy Piping Products, Inc., and Taylor Forge Stainless, Inc. ("Petitioners")—urged Commerce to find Top Line's tube fittings to be covered by the Order. Letter from Collier Shannon Scott to the Secretary of Commerce (May 4, 2001), at 1–2, P.R.

---

[2]  On July 31, 2000, Commerce, pursuant to 19 U.S.C. § 1675, initiated an administrative review of the Final Antidumping Order, covering the period from June 1, 1999 to May 31, 2000. Initiation of Antidumping and Countervailing Duty Administrative Reviews and Requests for Revocation in Part, 65 Fed. Reg. 46,687, 46,688 (Dep't Commerce July 31, 2000).

2:5:1, Def.'s App. at 71–72 [Hereinafter Collier Shannon Letter (May 4, 2001)].  Petitioners

argued that Top Line's Second Scope Request failed to distinguish its tube fittings from the

subject butt-weld pipe fittings.  Id. at 2, Def.'s App. at 72.  Petitioners also emphasized  a

purported admission by Top Line in its first scope proceeding that its butt-weld fittings were

covered by the Order.  Id. at 3–4, Def.'s App. at 73–74.[3]

In response to a supplemental questionnaire from Commerce, Top Line specified the

parameters of its scope request and discussed the points raised by Petitioners.  See Letter from

Reed Smith to Secretary of Commerce (May 11, 2001), P.R. 4:5:35, Pl.'s App., Doc. 4.  This

letter reemphasized the purported physical differences between tube and pipe.  Id. at 2–4, Pl.'s

App., Doc. 4 at 2–4.  Shortly thereafter, Top Line submitted samples of two types of

sanitary/hygienic stainless steel butt-weld tube fittings for review by Commerce.  Letter from

Reed Smith to Secretary of Commerce (May 18, 2001), P.R. 5:5:66, Pl.'s App., Doc. 5.

Commerce found the parties' submissions and the existing agency work to be an

---

[3] In a footnote to the First Scope Ruling, Commerce observed that "Top Line acknowledges that it does market a line of butt-weld tube fittings, such as elbows, tees, and reducers that do fall under the scope of the order.  However, Top Line states that it does not import these products into the United States."  First Scope Ruling, at 5 n.1, Pl.'s App., Doc. 3, Ex. 12 at 5.  The footnote does not provide a citation for the alleged acknowledgment.  Top Line argues that this purported acknowledgment was actually a mischaracterization of a statement that only admitted that the company marketed a line of butt-weld tube fittings, not that those tube fittings fell within the scope of the Order.  Pl.'s Reply Br. at 3 (citing See Letter from Reed Smith (May 11, 2001), at 2–3, P.R. 4:5:35, Pl.'s App., Doc. 4, at 2–3).  In any event, Commerce refined its interpretation of this purported admission, and used it "as support only for its conclusion that the information on the record prior to the initiation of the formal scope inquiry did not offer a clear distinction between pipe and tube butt-weld fittings."  Final Affirmative Scope Ruling, at 4–5, P.R. 29:13:33, Pl.'s App., Doc. 1, at 4–5.

insufficient basis for decision and, consequently, determined that a formal scope inquiry was required under C.F.R. § § 351.225(d) and (k)(1).  Letter from Edward C. Yang to All Interested Parties, (Dep't Commerce May 24, 2001), at 1–2, P.R. 9:5:78, Def.'s Appx. at 86–87 [hereinafter Formal Scope Initiation Letter].  In commencing the formal scope inquiry, Commerce requested that interested parties submit comments regarding their products that address the five criteria originally set forth in Diversified Products Corp. v. United States, 6 CIT 155, 572 F. Supp. 883 (1983), and incorporated into regulation by 19 C.F.R. § 351.225 (k)(2) (2003): (1) the physical characteristics of the product; (2) the ultimate use of the product; (3) the expectations of the ultimate purchaser; (4) the channels of trade in which the product is sold; and (5) the manner in which the product is advertised and displayed.  Id. at 2, Def.'s Appx. at 87.

In response to the Formal Scope Initiation Letter, Top Line and Petitioners submitted comments discussing the Diversified Products Criteria on June 12, 2001.  Letter from Reed Smith to Secretary of Commerce, (June 12, 2001), P.R. 11:7:1, Pl.'s App., Doc. 7 [hereinafter Top Line Scope Comments];  Letter from Collier Shannon to Secretary of Commerce (June 12, 2001), P.R. 10:6:1, Def.'s App. at 101.[4]

In discussing the first criteria—physical characteristics—Top Line argued that "'pipe' and 'tube or tubing' are precise terms describing different products." Top Line Scope Comments, at 2, Pl.'s App., Doc. 7, at 2.  In support of this claim, Top Line alleged that, in contrast to pipe

---

[4] On June 22, 2001, Top Line and Petitioners submitted rebuttal comments.  Letter from Reed Smith to Secretary of Commerce (June 22, 2001), P.R. 13:9:1, Pl.'s App., Doc. 8; Letter from Collier Shannon to Secretary of Commerce (June 22, 2001), P.R. 12:8:44.

fittings, tube fittings have square cut (i.e. non-beveled) ends; are designated by its outside diameter rather than its inside diameter; and have their wall thickness identified by the term "gauge" as opposed to the term "schedule," which is used for pipe fittings.  Id. at 7, Pl.'s App., Doc. 7, at 7.

Second, regarding the ultimate use of the product, Top Line claimed that tube fittings are to be used in applications involving sanitary processing of consumable products, or manufacturing of products requiring extreme purity.  Id. at 8, Pl.'s App., Doc. 7, at 8.  Top Line contrasted these applications with those of pipe fittings, which it described as almost exclusively industrial applications that do not require sanitary or hygienic conditions.  Id. at 8-9, Pl.'s App., Doc. 7, at 8–9.  Top Line also asserted that "pipe is generally intended for high temperature and high pressure applications [while] tube fittings are not used when either extremely high or low temperatures are present, nor are they used in 'high pressure' applications."  Id. at 9, Pl.'s App., Doc. 7, at 9.

As for the third criteria—the expectations of the ultimate purchaser—Top Line argued that because its tube fittings are not used in the same applications as pipe fittings, the expectations of the ultimate purchaser of sanitary/hygienic stainless steel butt-weld tube fittings are different from that of the ultimate purchaser of pipe fittings.  Id.

Top Line then discussed the fourth criteria, channels of trade, stating that, "to the best of [its] knowledge and belief," King Lai is not a supplier of pipe fittings.  Id. at 9–10, Pl.'s App., Doc. 7, at 9–10.   Top Line also indicated that the Petition did not identify Top Line as a U.S.

distributer of pipe fittings, nor was Top Line's proposed port of import, Pittsburgh, listed by

Petitioners as a port of import for pipe fittings.  Id. at 10, Pl.'s App., Doc. 7, at 10.

Regarding the fifth criteria, the manner of advertising and display, Top Line argued that it

is a member of certain industry associations that "define the potential end-users of stainless steel

butt-weld tube fittings useable in sanitary and hygienic applications."  Id. at 11, Pl.'s App., Doc.

7, at 11.  Top Line also noted that it advertises in particular trade journals, such as

*Pharmaceutical Processing* and *Food Manufacturing*, whereas Petitioners and other domestic

producers of stainless steel butt-weld pipe fittings do not.  Id.

At the conclusion of the comment period, Commerce made a preliminary determination

that Top Line's sanitary/hygienic stainless steel butt-weld tube fittings are within the scope of the

Final Antidumping Order.  Memorandum from Edward C. Yang to Joseph A. Spetrini:

Preliminary Scope Ruling on the Antidumping Duty Order on Stainless Steel Butt-Weld Pipe

Fittings: Allegheny Bradford Corporation d/b/a Top Line Process Equipment (Dep't Commerce

Nov. 15, 2001), P.R. 22:12:65, Pl.'s App., Doc. 2, at 2 [hereinafter Preliminary Scope Ruling].

In the Preliminary Scope Ruling, Commerce addressed the regulatory factors to be applied in the

case of ambiguous orders.  The Department then gave Top Line and Petitioners an opportunity to

comment.  Top Line and Petitioners responded by filing comment briefs, followed by rebuttal

briefs.  Letter from Reed Smith to Secretary of Commerce, (Nov. 21, 2001), P.R. 25:13:4, Pl.'s

App., Doc. 11; Letter from Collier Shannon Scott to Secretary of Commerce, (Nov. 21, 2001),

P.R. 26:13:17., Def.'s App. at 169; Letter from Reed Smith to Secretary of Commerce, (Nov. 26,

2001), P.R. 28:13:30, Def.'s App. at 171; Letter from Collier Shannon Scott to Secretary of

Commerce, (Nov. 26, 2001), P.R. 27:13:21, Def.'s App. at 173.

On December 10, 2001, Commerce issued the Final Affirmative Scope Ruling, which found Top Line's tube fittings to be within the scope of the Final Antidumping Order. Final Affirmative Scope Ruling, Pl.'s App., Doc. 1. The Final Affirmative Scope Ruling reiterated that the scope could not be determined through informal inquiry and then applied each of the Diversified Products criteria.

First, regarding the physical characteristics of pipes and tubes, Commerce reaffirmed its preliminary determination that "the interchangeability of [the terms "pipe" and "tube"] precludes a finding of a distinction, based on terms alone." Final Affirmative Scope Ruling, at 9, Pl.'s App., Doc. 1, at 9.[5] Commerce then sought to clarify certain points from industry publications, which it had considered when analyzing Top Line's product in the Preliminary Scope Ruling. For instance, Commerce pointed out that statements contained in an article from *Fabricator*, a trade journal, rebutted Top Line's arguments regarding differences in the diameter, thickness, technical composition, and mechanical properties of stainless steel pipe fittings versus stainless steel tube fittings. Final Affirmative Scope Ruling, at 10-11, Pl.'s App., Doc. 1, at 10–11.

Regarding the ultimate use of the product, Commerce defended the validity of determining ultimate uses in part by the ultimate users of the product. Id. at 13, Pl.'s App., Doc.

---

[5] Petitioners argued to Commerce that certain fittings—unfinished fittings, A774 fittings and those with Schedule 5S wall thickness—were clearly covered by the Order even though they had square-cut, non-beveled edges like Top Line's fittings. Letter from Collier Shannon (June 12, 2001), at 4, Def.'s App. at 104. Commerce, however, did not specifically discuss edging in stating its final position on physical characteristics. Final Affirmative Scope Ruling, at 9–11, Pl.'s App., Doc. 1, at 9–11.

1, at 13.  Commerce then rejected Top Line's contention that a sanitary/hygienic tube fitting—as opposed to a pipe fitting—is always used for conveying food, beverage, and pharmaceutical products.  Id. at 13, Pl.'s App., Doc. 1, at 13.  The Department supported this position by citing Top Line's admission that pipe fittings may be used for "dirty" applications in any kind of manufacturing facility, including those in the dairy, food, beverage, and pharmaceutical process industries.  Id. at 13, Pl.'s App., Doc. 1, at 13 (citing Letter from Reed Smith (May 11, 2001), at 3, Pl.'s App., Doc. 4, at 3).  On this basis, Commerce concluded that the uses for tube and pipe fittings overlap.  Id.  Commerce explained the significance of this overlap by referring to its 1993 ruling on A774 pipe fittings.  According to Commerce, the A774 ruling demonstrated that "meeting one or more of several factors [listed in the scope section of the Order] will cause a product to fall within the scope of the [Order]."  Final Affirmative Scope Ruling, at 13–14, Pl.'s App., Doc. 1, at 13–14.

In terms of the expectations of the ultimate purchaser, Commerce reasoned that, because Top Line and Petitioners share common distributers, the record indicates "that pipe and tube fittings are being sold to the same ultimate customer."  Id. at 16, Pl.'s App., Doc. 1, at 16.  According to Commerce, the expectations of the ultimate purchasers of tube fittings are similar to the expectations of the ultimate purchasers of pipe fittings because the products have similar uses, applications, channels of trade, and manners of advertising and display.  Id.

Regarding channels of trade, Commerce observed that Top Line did not contest the fact that it shares common distributors with Petitioners, who sell stainless steel butt-weld pipe fittings.  Id. at 17, Pl.'s App., Doc. 1, at 17.  Commerce used this commonality to support its

determination that Top Line's tube fittings are within the scope of the Order.   Final Affirmative

Scope Ruling, at 17, Pl.'s App., Doc. 1, at 17.

Commerce analyzed the manner of advertising and display as the last step in its inquiry.

The Department agreed with Top Line that its tube fittings were sold on separate product lists, in

separate sections of catalogues, and on separate segments of websites, but discounted these

considerations on the ground that Top Line's marketing choices are not probative of industry-

wide marketing practices.  Id. at 19, Pl.'s App., Doc. 1, at 19.  Commerce then determined that

Top Line's tube fittings are not distinguished from the subject merchandise by their method of

advertising and display because Top Line uses different terminology than does King Lai, its

Taiwanese producer, to describe the same fittings.  Id.

Top Line filed suit with the court in January 2002.  On June 17, 2002, the Company

moved for a judgment on the agency record on the grounds that the Final Affirmative Scope

Ruling is "unsupported by substantial evidence on the record and otherwise not in accordance

with law."  Pl.'s Op. Br. at 1.  Oral argument on the motion was held on April 6, 2004.  The court

has jurisdiction over this motion pursuant to 28 U.S.C. § 1581(c) (2000).

**DISCUSSION**

The issue in this case is whether Commerce may construe an antidumping order to cover

products which bear a characteristic that cannot be reconciled with the language of the order.

The Antidumping Duty Order, in language very similar or identical to the Petition, Preliminary

Determination, and Final Determination before it, stipulates that "[t]he edges of finished pipe

fittings are beveled." Antidumping Duty Order, 58 Fed. Reg. at 33,250. Top Line's tube fittings, whether finished or unfinished, are not beveled. Second Scope Request, at 6, Pl.'s App., Doc. 3, at 6.

I.      STANDARD OF REVIEW

The court must sustain Commerce's scope determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (2000); see also Novosteel SA v. United States, 128 F. Supp. 2d 720, 724–725 (Ct. Int'l Trade 2001). The court gives significant deference to Commerce's interpretation of its own orders, but a scope determination is not in accordance with the law if it changes the scope of an order or interprets an order in a manner contrary to the order's terms. See Duferco Steel, Inc. v. United States, 296 F.3d 1087, 1094–95 (Fed. Cir. 2002) (quoting Eckstrom Indus., Inc. v. United States, 254 F.3d 1068, 1072 (Fed. Cir. 2001)).

II.     APPLICABLE LAW

In determining whether a product is within the scope of an antidumping duty order, Commerce is governed by a two-step process set forth in 19 C.F.R. § 351.225(k) (2003). First, § 351.225(k)(1) requires that Commerce make its determination by taking into account "[t]he descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary (including prior scope determinations) and the Commission." 19 C.F.R. § 351.225(k)(1). If those criteria are not dispositive, Commerce then evaluates the product according to the Diversified Products factors; namely "(i) [t]he physical characteristics of

the product; (ii) [t]he expectations of the ultimate purchasers; (iii) [t]he ultimate use of the product; (iv) [t]he channels of trade in which the product is sold; and (v) [t]he manner in which the product is advertised and displayed."  19 C.F.R. § 351.225(k)(2).

The introductory paragraph of § 351.225 explains that the interpretive rules for scope determinations are necessary to resolve issues that arise because "the descriptions of subject merchandise contained in the Department's determinations must be written in general terms." See 19 C.F.R. § 351.225(a).  Indeed, a common issue in scope cases is whether Commerce acted properly in determining that a particular product is covered by an order's general terminology. See, e.g., Novosteel SA v. United States, 284 F.3d 1261, 1264 (Fed. Cir. 2002) (rejecting plaintiff's argument that the antidumping and countervailing duty orders required more specific language); Wirth Ltd. v. United States, 22 CIT 285, 294, 5 F. Supp. 2d 968, 976 (1998) (noting that "[the] absence of a reference to a particular product in the Petition does not necessarily indicate that the product is not subject to an order").

It is important to distinguish such cases from circumstances in which an order's relevant terms are unambiguous.  The language of an order is the "cornerstone" of a court's analysis of an order's scope.  See Duferco, 296 F.3d at 1097–98 (citing Eckstrom, 254 F.3d at 1073). Commerce need only meet a low threshold to show that it justifiably found an ambiguity in scope language, see Novosteel, 284 F.3d at 1272, but it is not justifiable to identify an ambiguity where none exists.  As noted above, Commerce cannot make a scope determination that conflicts with an order's terms, nor can it interpret an order in a way that changes the order's scope.  Duferco, 296 F.3d at 1087, 1094–95 (quoting Ericsson GE Mobile Communications v. United States, 60

F.3d 778, 782 (Fed. Cir. 1995)).[6]  Here, Commerce "interpreted" the Order in a manner contrary

to its terms.  Commerce maintains that beveled edges are not necessary for inclusion in the

Order, despite what the Order says.

### III.    THE ANTIDUMPING DUTY ORDER

The Antidumping Duty Order's scope description begins by providing that "[t]he

products subject to this investigation are certain stainless steel butt-weld pipe fittings, whether

finished or unfinished, under 14 inches inside diameter."  58 Fed. Reg. at 33,250.  The remainder

of the scope section specifies primarily the potential applications and shapes of the subject

merchandise.  This language makes it clear that the Order does not apply to all stainless steel

butt-weld pipe fittings with an inside diameter under 14 inches, but rather a subset of such

fittings.  See Eckstrom, 254 F.3d at 1073 (rejecting a construction of the Antidumping Duty

Order which would cover any stainless steel butt-weld pipe fittings under the 14 inch diameter

limit).  Among the sentences describing the subset of fittings covered by the Order is the

following:  "The edges of finished pipe fittings are beveled."  58 Fed. Reg. at 33,250.

Although the Order's beveling language is not subject to interpretation in this

context—i.e., because a given fitting either does or does not have beveled edges—a review of the

_____

[6] Even if a potential interpretation is not clearly precluded by an order's terms, the interpretation must nevertheless constitute a reasonable construction of those terms:  "Scope orders may be interpreted as including subject merchandise only if they contain language that specifically includes the subject merchandise or may be reasonably interpreted to include it." Duferco, 296 F.3d at 1089; Smith Corona Corp. v. United States, 915 F.2d 683, 686 (Fed. Cir. 1990) (holding that Commerce cannot construe its scope orders to include products that are outside those orders).

Petition and the investigation documents confirms that the beveling language is not an aberration

that inadvertently found its way into the Order.[7]  Indeed, the beveling requirement has been a

consistent feature of the investigation's scope since it appeared in the Petition:

> A characteristic of all stainless steel butt-weld pipe fittings is that the edges of
> finished fittings are beveled so that when placed against the end of a pipe (the
> ends of which have also been beveled) a shallow channel is created to
> accommodate the 'bead' of the weld which joins the fittings to the pipe.

Petition, at 4, Pl.'s App., Doc. 3, Ex. 4, at 4.[8]  After its appearance in the Petition, the beveling

requirement appeared in each of Commerce's pronouncements as it proceeded with the

investigation.  With Commerce's notice that it was initiating an investigation—its first

opportunity to publicize the scope—it stated in the scope section that "[t]he edges of finished

fittings are beveled."  Notice of Initiation of Investigation, 57 Fed. Reg. at 26,645.  The same

exact sentence appears in the scope section of the Preliminary Determination.  57 Fed. Reg. at

61,047.  After the interested parties commented on the Preliminary Determination, Commerce

made two pertinent changes to the scope language with the issuance of the Final Determination.

First, the beveling sentence was changed to refer to "pipe fittings" instead of simply "fittings."

Final Determination, 58 Fed. Reg. at 28,556.  Second, the scope section of the Final

---

[7]  A review of the petition and investigation may assist the interpretation of an order, but "they cannot substitute for language in the order itself . . . . a predicate for the interpretive process is language in the order that is subject to interpretation."  Duferco, 296 F.3d at 1097.

[8]  The court can only assume that this language was included as part of the requirements for a petition.  "Petitions must contain (among other things) a 'detailed description of the subject merchandise that defines the requested scope of the investigation.'"  Novosteel, 284 F.3d at 1271 (quoting 19 C.F.R. 351.202(b)(5)).

Determination contained two additional paragraphs setting forth Commerce's determination that pipe fittings conforming to specification A774 are covered by the scope. Id. While the Final Determination does not state that A774 fittings do not have beveled edges, it makes parenthetical reference to the Concurrence Memorandum, which does so. Concurrence Memorandum, at issue 3, Pl.'s App., Doc. 3, Ex. 11 at 4. Despite the reference to A774 fittings, the Final Determination retained the scope language describing the subject merchandise as having beveled edges. The beveled edge stipulation was again repeated in the Order, which removed the parenthetical reference to the Concurrence Memorandum. 58 Fed. Reg. at 33,250.

The ITC also characterized the subject merchandise as having beveled edges.[9] The Final Injury Determination incorporated by reference the product description set forth in the Korea Final Injury Determination. Final Injury Determination, USITC Pub. 2641 at *1. The second and third sentences of that product description discuss beveling as a distinguishing feature of the subject merchandise:

> The beveled edges of butt-weld fittings distinguish them from other types of pipe fittings, such as threaded, grooved, or bolted fittings, which rely on different fastening methods. When placed against the end of a beveled pipe or another fitting, the beveled edges form a shallow channel that accommodates the "bead" of the weld that fastens the two adjoining pieces.

Korea Final Injury Determination, USITC Pub. 2601 at *27–*28.

Despite the consistent use of beveled edges to help define the scope in the Order and

---

[9] As an antidumping order cannot be issued without affirmative determinations of both the ITC and Commerce, it is important that the same type of merchandise be investigated by both agencies.

other relevant documents, Commerce applied the § 351.225(k) criteria in the instant proceeding as if the Order's scope consisted of general terms that required significant interpretation. Such efforts were unnecessary. Any potential ambiguities in this case—for example, the distinction between pipe and tube fittings—are rendered moot by the irreconcilability of the Order's beveling sentence with the edging characteristics of Top Line's fittings. There is nothing more to interpret: the plain language of the Order does not encompass Top Line's non-beveled fittings.

This conclusion results from the Order's use of unequivocal language to describe the edges of the subject merchandise. The Order does not provide that the edges of finished pipe fittings "may be" or "are generally" beveled; either the edges are beveled or the fitting is not covered. This either/or proposition must be addressed before reaching the second stage of the interpretive process. While application of the Diversified Products criteria is appropriate in a case such as Novosteel, where the plaintiff could not identify "any language in any of the sources (the petitions and the initial determinations by Commerce and the ITC) used to initially construe those Orders that would exclude its . . . product," 284 F.3d at 1270, the opposite is true here. In the Petition, the Notice of Initiation of Investigation, and the Preliminary Determination, and as well as in the Final Determination and the Order, the scope description includes a sentence requiring beveled edges, a sentence that cannot logically be construed to describe Top Line's fittings.

Beveling is not the only characteristic which can be ascertained without extensive inquiry and which the Order, by the logic of its language, requires for inclusion within its scope. For example, the scope section begins by describing the subject merchandise as certain fittings which

are "under 14 inches inside diameter." <u>Antidumping Duty Order</u>, 58 Fed. Reg. at 33,250.  It is elementary to determine which fittings have an inside diameter under 14 inches and which do not.  There is also no doubt that the <u>Order</u> does not cover fittings with inside diameters of greater than 14 inches.  This conclusion is inescapable, even though the <u>Order</u> does not affirmatively and explicitly exclude such fittings.

In contrast to characteristics that can be clearly ascertained and which the <u>Order</u> requires of subject merchandise in unequivocal language, other aspects of the scope description leave room for interpretation.  The second paragraph of the <u>Order's</u> scope section provides that "[t]he subject merchandise is used where one or more of the following conditions is a factor in designing the piping system," and then lists five conditions, such as the presence of high temperatures.  <u>Id.</u>, 58 Fed. Reg. at 33,250.  Through the use of the phrase "one or more," the <u>Order</u> gives Commerce a certain amount of room to interpret whether a product may be included within the scope, based on the number and type of conditions the product fulfills.  <u>See</u> <u>Eckstrom</u>, 254 F.3d at 1072–73 (discussing the significance of the <u>Order's</u> specification that subject merchandise meet "one or more" of the five conditions of use).

The <u>Order</u> also describes the possible shapes of the subject fittings in general terms: "Pipe fittings come in a variety of shapes with the following five shapes the most basic: 'elbows', 'tees', 'reducers', 'stub ends', and 'caps'."  58 Fed. Reg. at 33,250.  The <u>Order</u> does not require that the subject merchandise conform to a particular shape or group of shapes.  Again, this terminology allows Commerce room to interpret whether a given product bears a shape that is covered by the scope.

The contrast between these general terms and the beveled edge language is clear. While the Order's language allows for Commerce to make an affirmative scope determination on a fitting that is not used where high temperatures are a factor in designing the piping system and where the fitting does not bear an "elbow" shape, it does not permit Commerce to include fittings that do not have beveled edges. Commerce is bound by "the general requirement of defining the scope of antidumping and countervailing duty orders by the actual language of the orders." See Duferco, 296 F.3d at 1098. An order cannot be interpreted broadly when a broad construction is "belied by the terms of the Order itself." Id. (quoting Eckstrom, 254 F.3d at 1073). The only exception to this rule occurs in certain situations where Congress, out of concern that orders might be circumvented, provided Commerce with discretion to make clarifications that would otherwise conflict with an order's literal scope. Wheatland Tube Co. v. United States, 161 F.3d 1365, 1370 (Fed. Cir. 1998) (discussing 19 U.S.C. § 1677j(d)). A circumvention determination is not at issue here. In the remaining areas of scope determinations, "Congress intended the language of the orders to govern." Duferco, 296 F.3d at 1098.[10]

---

[10] The force of an order's plain language is so great that, where the order's language is clearly inapplicable to a plaintiff's product, the imposition of duties on such a product constitutes a mere ministerial error that may be protested to Customs instead of Commerce. See Xerox Corp. v. United States, 289 F.3d 792, 795 (Fed. Cir. 2002) (finding plaintiff's belts to be clearly outside the scope of an order pertaining to belts used for power transmission because they were not used for power transmission and were not constructed with the materials listed in the order).

**IV.     COMMERCE'S PRIOR INCLUSION OF NON-BEVELED A774 FITTINGS**

Perhaps because it cannot otherwise avoid the <u>Order's</u> beveling language, the

Government relies entirely on the fact that Commerce included non-beveled A774 fittings in the

<u>Final Determination</u>:  "Commerce's ruling upon A774 fittings shows that beveling is not an

absolute requirement for a product to fall within the scope of the order."  Def.'s Br. at 26.   This

argument presumes that the <u>Concurrence Memorandum's</u> A774 ruling carries the weight of

precedential authority.  The ruling does not deserve such treatment in this case:  it was made at a

late stage in the investigation and in irregular fashion; was reached without a thorough inquiry;

and was based on unpersuasive reasoning.[11]

**A.      The Lateness and Irregularity of the A774 Ruling**

By including a product that cannot be reconciled with the omnipresent beveling

language, the A774 ruling purports to amend the investigation's scope concurrent with the

issuance of the <u>Final Determination</u>, a very late stage in the investigation.  "Commerce retains

broad discretion to define and clarify the scope of an antidumping investigation in a manner

which reflects the intent of the petition."  <u>Mitsubishi Heavy Indus., Ltd. v. United States</u>, 21 CIT

---

[11]  In this case, some tension exists between Commerce's duty to abide by the language of its orders and the inclusion of non-beveled A774 fittings in the <u>Final Determination</u>, which references the <u>Concurrence Memorandum</u>.  "Commerce must either act in accord with its prior, similar scope determinations or else provide 'rational reasons for deviating' from them." <u>Novosteel</u>, 284 F.3d at 1271 (discussing this Court's holding in <u>Springwater Cookie & Confections, Inc. v. United States</u>, 20 CIT 1192, 1196 (1996)).  Commerce suggests that one brief, ill-reasoned section of the <u>Concurrence Memorandum</u> should prevail over its duty to abide by the clear language of its order.  To demonstrate the error of this approach, it is necessary to examine the flaws of the A774 ruling, even though it is not before the court.

1227, 1232, 986 F. Supp. 1428, 1433 (1997) (quoting Minebea Co. v. United States, 16 CIT 20, 22, 782 F. Supp. 117, 120 (1992)); but see Royal Bus. Mach., Inc. v. United States, 1 CIT 80, 87, 507 F. Supp. 1007, 1014 (1980) (discussing the constraints of prior administrative action: "Each stage of the statutory proceeding maintains the scope passed on from the previous stage"). There is no clear point during the course of an antidumping investigation at which Commerce loses the ability to adjust the scope, but Commerce's discretion to define and clarify the scope of an investigation is limited in part by concerns for the finality of administrative action, which caution against including a product that was understood to be excluded at the time the investigation began. Mitsubishi, 21 CIT at 1231-32, 986 F. Supp. at 1433.

The inclusion of A774 fittings raises concerns for the finality and regularity of administrative action because it occurred late in the investigation; i.e., after completion of the ITC investigation and concurrent with the issuance of the Final Scope Determination. In Mitsubishi, the Court affirmed Commerce's scope determination in part because the clarification occurred early in the process (upon the issuance of the notice of investigation), thereby alleviating concerns of administrative finality and regularity. The ruling in Mitsubishi also demonstrated that, at some point, Commerce may, if it sees fit, delete some language from the petition's description of the subject merchandise in order to "further clarify" the scope of the

investigation.[12]  Id., 21 CIT at 1232, 986 F. Supp. at 1430.

Because Commerce in the instant case ruled on non-beveled A774 fittings at a much later stage than the change in Mitsubishi—i.e., concurrent with the issuance of the Final Determination—it could not have removed the beveling sentence from the scope language without compromising the integrity of the investigation's prior stages.  If, however, Commerce felt that it was too late to "clarify" the scope by deleting the beveling language, it should have declined to include the A774 fittings, which were outside the plain language of the Order. Instead of pursuing an approach that would ensure the integrity and coherence of the scope language, Commerce included A774 fittings without removing the sentence requiring beveled edges.  Commerce now proposes that the collateral effect of the A774 ruling is to nullify the beveling language, even while the language remains in the Order.  Commerce cites no statute or regulation authorizing it to clarify or amend an investigation's scope by collateral nullification. Such an irregular maneuver does not merit judicial endorsement as a valid administrative precedent, especially considering the serious finality concerns it raises.

## B.      The Lack of a Thorough Inquiry

The precedential value of the A774 ruling is undermined not only by its timing and irregularity, but also by the consideration that the ruling was not the outcome of a standard,

---

[12]  At issue in that case was the definition of "unassembled components," and Commerce's clarification of that term was upheld in part because Commerce had not consistently interpreted "unassembled" and "incomplete" as two mutually exclusive terms.  Id., 21 CIT at 1232, 986 F. Supp. at 1434.  The Court refrained from deciding whether Commerce may contract the scope of an investigation, however.  Id., 21 CIT at 1230 n.6, 986 F. Supp. at 1432 n.6.

thorough scope determination process. Commerce's general obligation to follow "prior, similar scope determinations," Novosteel, 284 F.3d at 1271, is premised in part on the fact that the prior decisions are indeed determinations, with formal procedures to ensure reliable results. See Springwater Cookie, 20 CIT at 1195 (requiring Commerce to abide by prior final scope determinations or provide rational reasons for deviating from them). Unlike the extensive procedures that governed Commerce's response to Top Line's scope requests, the A774 ruling came in response to an inquiry that was submitted during the comment period that followed the Preliminary Determination. See Antidumping Duty Order, 58 Fed. Reg. at 33,250 ("After it withdrew from this investigation, [TYH] inquired whether A774 type stainless steel pipe fittings were included within the scope of the investigation"). Commerce did not issue a preliminary affirmative scope ruling and thus did not have the benefit of the commentary that might have followed. It did not issue a final affirmative scope ruling that provided a thorough explanation for its decision. Instead, A774 fittings were included within the scope of the Order on the basis of a two-paragraph team recommendation in the Concurrence Memorandum, which was not included or referenced in the Order. Accordingly, the rationale for following the A774 ruling as a "prior, similar scope determination" fails.

### C.     Unpersuasive Reasoning

The precedential value of the A774 ruling is undermined not only by its procedural flaws and superficial level of inquiry, but also by the limitations of its substantive claims. While the ruling's brief discussion admits that "[t]he scope does state that the edges of finished fittings are beveled," it counters with nothing more than unpersuasive assertions: (1) that the statement

pertaining to beveled edges "is not a requirement;" (2) that the statement is not made "with

respect to unfinished fittings;" and (3) that the scope language "only specifically excludes

threaded, bolted and grooved fittings, and none of these criteria apply to A774 fittings."

Concurrence Memorandum, at issue 3, Pl.'s App., Doc. 3, Ex. 11 at 4.  These cursory statements

provide no rational basis for nullifying the plain language of the Order as it pertains to Top

Line's tube fittings.

The first assertion—that beveling is not a requirement—is made without providing any

basis in statute or regulation for distinguishing between "requirements" and other allegedly

superfluous language.  In its brief to the court, the Government promotes this distinction as if it

needs no explanation:  "previous scope rulings have consistently held that beveling is not an

essential physical characteristic for a product to fall within the scope of this order."[13]  Def.'s Br.

at 35.  What is essential, according to the Government, is that the components of the fittings are

butt-welded.  Def.'s Br. at 35 (describing butt-welding as the "most important aspect" of the

Order).  The implication is that other specifications in the Order may be ignored when they

impede the Order's application to a given butt-welded product.  See id.  If Commerce is correct

on this point, the beveling characteristic may be ignored as surplusage.  Recourse to the §

351.225(k)(2) Diversified Products criteria might then be appropriate.  There is, however, little,

if any, support for the proposition that some portions of the physical description of the subject

merchandise are essential while others are superfluous.

----

   [13]  Which prior scope rulings these are is not clear, as the Government provides no citations after making this claim and refers only to the A774 ruling in other sections of its brief. Top Line, in contrast, cites two previous scope determinations—interpreting a different order on butt-weld fittings—in which Commerce found beveling to be critical in placing the products outside the scope of the order.  See Stainless Steel Butt-Weld Pipe and Tube Fittings from Japan, 60 Fed. Reg. 54,213 (Dep't Commerce Oct. 20, 1995) (Notice of Scope Rulings) ("A characteristic of all stainless steel butt-weld pipe fittings is that the edges of finished fittings are beveled so that when placed against the end of a pipe (the ends of which have also been beveled) a shallow channel is created to accommodate the 'bead' of the weld which joins the fittings to the pipe"); Stainless Steel Butt-Weld Pipe and Tube Fittings from Japan, 61 Fed. Reg. 40,194 (Dep't Commerce Aug. 1, 1996) (Notice of Scope Rulings) ("[W]e conclude that [the merchandise] whose ends are square-cut, not beveled, and thus, not designed to be butt-welded, are not the same merchandise as that covered by the scope order").  These two scope determinations turned on the issue of beveling alone.
   Commerce contends that, because its determinations must be based upon the record established in the case before it, the scope established in one investigation should have no bearing upon the determination of the scope in another investigation.  Def.'s Br. at 24.  The determinations themselves, however, are public records and may be considered with respect to Commerce's past practices.  Commerce's past practices in Stainless Steel Butt-Weld Pipe and Tube Fittings from Japan are particularly relevant because the petition in that case used language identical to that of the instant Petition to characterize the subject merchandise as having beveled edges.

The Federal Circuit rejected a previous attempt by Commerce to interpret the Antidumping Duty Order as "covering any stainless steel butt-weld pipe fittings in diameter," because such a broad construction would render some of the scope language as "mere surplusage." Eckstrom, 254 F.3d at 1073. Even though the Eckstrom plaintiff's pipe fittings were intended for butt-weld connections, this was an insufficient basis for inclusion within the order. Id. Commerce is not at liberty to ignore the plain terms of an order on the theory that a broad interpretation of the order will best promote the intent of the petitioners. To allow for unsubstantiated distinctions between a scope's "requirements" and other, supposedly non-essential language is to invite arbitrariness and uncertainty into the process by which Commerce administers antidumping duty orders.

Commerce's approach also constitutes an improper heightening of the standard faced by a plaintiff seeking to exclude its product. Commerce cannot abandon an order's scope standard in favor of "a different, more exacting one" that a plaintiff must meet in order to have its product excluded from the scope. See Ericsson GE Mobile Communications v. United States, 60 F.3d 778, 783 (Fed. Cir. 1995) (rejecting Commerce's imposition of a "rigid requirement[] of proof of commercial availability" where the order was much less specific in terms of exclusionary end uses). A different, more exacting exclusionary standard is created where Commerce uses a selective reading to nullify portions of an order's scope language which would otherwise exclude a plaintiff's product. Commerce imposed such a standard on Top Line when it adopted the reasoning of the A774 ruling. In so doing, Commerce "strayed beyond the limits of interpretation and into the realm of amendment." See id. at 782.

In the second of its unpersuasive assertions, the <u>Concurrence Memorandum</u> observes that the beveling language does not pertain to unfinished fittings.  <u>Concurrence Memorandum</u>, at issue 3, Pl.'s App., Doc. 3, Ex. 11 at 4.  The relevance of this observation to A774 fittings is unclear, as the <u>Concurrence Memorandum</u> gives no indication that they are imported in an unfinished state.  <u>See</u> <u>id.</u>  In any case, the observation is clearly irrelevant with regard to the products at issue here.  Top Line's fittings do not have beveled edges, regardless of whether they are finished or unfinished.  There is no record evidence to suggest that unfinished versions of Top Line's fittings would be beveled after entry into the United States.

As for the <u>Order's</u> failure to exclude non-beveled fittings explicitly, <u>Duferco</u> extinguished the theory that a product could be covered by an order merely because the order does not explicitly exclude it.  296 F.3d at 1096.  Here, the beveling sentence immediately precedes the explicit exclusion sentence, and there is no indication that one sentence helps to define the scope while the other does not.   Accordingly, Commerce proved little, if anything, by observing that "our scope language only specifically excludes threaded, bolted and grooved fittings, and none of these criteria apply to A774 fittings."  <u>Concurrence Memorandum</u>, at 4, Pl.'s App., Doc. 3, Ex. 11 at 4.

## CONCLUSION

Because Commerce cannot interpret an antidumping order in a manner contrary to the clear terms that were a consistent part of the investigation, Top Line's fittings are outside the scope of the <u>Antidumping Duty Order</u>.  No recourse to the § 351.225(k)(2) <u>Diversified</u>

Products criteria is warranted.  Commerce's ruling to the contrary was therefore not in accordance with the law.  Accordingly, the motion for judgment on the agency record is granted, judgment shall be entered for Top Line, and Commerce must exclude Top Line's stainless steel butt-weld tube fittings from the scope of the Antidumping Duty Order.


/s/ Jane A. Restani
Jane A. Restani
Chief Judge


Dated:  This 4th day of June, 2004.
          New York, New York